# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID BURKE; MELISSA BURKE;
CLIFTON FARINA,
     *Plaintiffs-Appellants,*

v.

COUNTY OF ALAMEDA; MARK
FOSTER, individually and as an
employee of the County of
Alameda; KURT VON SAVOYE,
individually and as an employee
of Alameda County, AKA Lou
Von Savoye; ANTHONY
BARTHOLOMEW,
     *Defendants-Appellees.*

No. 08-15658

D.C. No.
06-CV-04533-SBA

OPINION

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Argued and Submitted
July 16, 2009—San Francisco, California

Filed November 10, 2009

Before: Dorothy W. Nelson, William A. Fletcher and
Richard A. Paez, Circuit Judges.

Opinion by Judge D.W. Nelson

15197

---

**COUNSEL**

Robert R. Powell, Law Offices of Robert R. Powell, San Jose, California, for plaintiffs-appellants Melissa Burke, David Burke, and Clifton Farina.

Catherine Wheeler, Andrada & Associates, PC, Oakland, California, for defendants-appellees Mark Foster, Anthony Bartholomew, and the County of Alameda.

---

**OPINION**

D.W. NELSON, Senior Circuit Judge:

This case involves the conflict between the right of families to be free of arbitrary governmental interference and the legitimate role of the state in protecting children from abuse.

In 2005, B.F., the fourteen-year old daughter of Melissa Burke and Clifton Farina, ran away from home. One week after she returned, Mark Foster, an Alameda County police

officer, met with B.F. to discuss formally the circumstances surrounding her runaway. During the interview, B.F. reported that David Burke, her stepfather, had physically and sexually abused her. Although Foster had no warrant and made no attempt to contact Farina, B.F.'s biological father, he took B.F. into protective custody because he believed that B.F. was in imminent danger of serious bodily injury.

Melissa[1] and Farina brought suit against Foster and the County of Alameda under 42 U.S.C. §1983, alleging, *inter alia*, that (1) Foster interfered with their constitutional right of familial association by removing B.F. without a protective custody warrant, and (2) the County caused their injury by failing to train its officers on the need to procure such warrants.

Melissa and Farina appeal the district court's grant of summary judgment in favor of Foster and the County.[2] We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm as to Foster, and vacate the judgment as to the County.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

B.F. is the fourteen-year old daughter of Melissa Burke and Clifton Farina. Melissa and Farina are divorced and David Burke is B.F.'s stepfather. Although Melissa and Farina shared joint legal custody of B.F., B.F. lived with the Burkes. Farina, however, called B.F. and saw her frequently.

On June 21, 2005, B.F. ran away from home with Ricardo Maciel, a nineteen-year old male. The Burkes immediately reported her as a runaway to the Alameda County Sheriff's Office ("ACSO"). At some point during the ensuing investi-

---

[1]For clarity, we refer to David and Melissa Burke by their first names.

[2]Appellants also challenge the grant of summary judgment with respect to several other claims. We address those claims in a separate memorandum filed concurrently with this opinion.

gation, the ACSO investigating officers heard "something about Mr. Burke having sexually molested his daughter."**³**

On July 3, 2005, approximately two weeks later, B.F. returned home of her own volition. The following week, Officer Mark Foster called the Burkes to schedule an interview with B.F. to discuss the circumstances surrounding the runaway. The Burkes scheduled the appointment for July 12, 2005 at the police station. B.F. was interviewed by a woman, Omparo Azuna, and Foster viewed the interview by monitor in another room.

During the first thirty-five minutes of the interview, Azuna talked to B.F. about the circumstances surrounding the runaway. B.F. stated that she left home because her stepfather was unduly strict. When Azuna asked B.F. more specifically about David, approximately halfway through the interview, B.F. disclosed that when she returned home on July 3, David immediately questioned her about Maciel. B.F. said that when she refused to disclose any information, David struck her fifteen times on the face with an open hand. After Melissa arrived, David again struck B.F. on the face and thighs. Melissa asked David to stop, but later commented that B.F. "deserved" the beating. The slaps left red marks.

B.F. further reported that David told her not to tell the police about the blows because "it would cause problems." He also told her that if she did not disclose Maciel's address to the officers, he was going to "beat [her] ass." B.F. stated that David had once "beaten up" her stepsister when she was fourteen and that her stepbrother had contemplated "pressing charges" against David.

B.F. stated that since the day of her return, David had not struck her. When asked if she felt safe, she replied in the affir-

---

**³**The officers could not recall the specifics of the source of the allegation.

mative, although she repeatedly expressed anxiety about whether her family would know what was discussed in the interview. B.F. stated that it would "be worse for her" when she arrived home because her parents would view the report as an attempt to blame them for her runaway. She believed that her stepfather would "go off" when she returned.

B.F. went on to report that David made inappropriate comments to her regarding her sexual partners and breasts and frequently called her "big titty mama." B.F. further stated that David pinched her on the buttocks on several occasions and repeatedly grabbed her breasts when he hugged her. The touching began in May 2004 and occurred every couple of days. The last time David had grabbed one of her breasts was approximately one week before she ran away from home. B.F. told her mother about the inappropriate conduct. Although her mother told David to stop, the touching continued.

When asked about Farina, her biological father, B.F. stated that he did not abuse her, but that she felt unwelcome in his home because her stepmother did not want her there.

Forty-five minutes into the interview, Foster was informed that David was acting "impatiently" and wanted to go to work. Foster refused to stop the interview but told David that he would give B.F. a ride home. Thirty minutes later, Melissa called and asked that Foster bring B.F. home. Foster again refused. Eventually, Melissa drove to the station to bring B.F. —who is diabetic— a shot of insulin.

Upon Melissa's arrival, Foster asked her to speak with him, and she agreed. During the interview, Melissa confirmed the beating and acknowledged that David engaged in "titty twisters" with B.F. Melissa characterized the "titty twisters" as a playful imitation of wrestling but admitted that the conduct was inappropriate. She confirmed that she had asked them both to stop. She blamed both B.F. and David, but stated that

B.F. "started it." Melissa denied any other sexual contact and accused B.F. of lying.

After interviewing Melissa, Foster did a follow-up interview with B.F., who confirmed the "titty twisters," but distinguished them from the breast grabbing. The "titty twisters" had only occurred four or five times and were different in kind— when he squeezed her breast he placed his entire hand on her breast and held it there for several seconds. When told that her mother denied the abuse, B.F. stated that she knew her mother would "take David's side."

Following the interviews Foster immediately advised the Burkes that he was removing B.F. from their home and placing B.F. in protective custody. He did not seek a protective custody warrant before doing so. He also did not discuss with Melissa alternatives to removal nor did he contact Farina or suggest taking B.F. to Farina's home. Farina found out about the removal two days later.

On July 25, 2006, David, Melissa, and Farina filed suit in the Northern District of California under 42 U.S.C. § 1983, claiming, *inter alia*, that removing B.F. without a warrant interfered with their constitutional right of familial association. They also included a claim against the County for failure to train its officers on the need to procure protective custody warrants. In late 2007, the parties filed cross-motions for summary judgment. The court granted summary judgment to the defendants and denied plaintiffs' motion. This timely appeal ensued.[4]

## II.   STANDARD OF REVIEW

"We review the grant or denial of summary judgment *de novo*." *Leever v. Carson City*, 360 F.3d 1014, 1017 (9th Cir.

---

[4]Appellants do not appeal the denial of their cross-motion for summary judgment.

2004). "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.*

## III. DISCUSSION

## A. 42 U.S.C. § 1983 CLAIM AGAINST MARK FOSTER

**[1]** "42 U.S.C. § 1983 provides a remedy to individuals whose constitutional rights have been violated by persons acting under color of state law." *Caballero v. City of Concord*, 956 F.2d 204, 206 (9th Cir. 1992). Where the defense of qualified immunity is at issue, as here, we apply a two-part inquiry to § 1983 claims. *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *see also Pearson v. Callahan*, 555 U.S. ___, 129 S. Ct. 808, 818 (2009) (concluding that "while the sequence set forth . . . [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory"). First, we ask whether the defendants' actions violated the Constitution. *Saucier*, 533 U.S. at 200. If there was a violation, we ask whether the right violated was clearly established. *Id.*

**[2]** "Parents and children have a well-elaborated constitutional right to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000). "That right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency." *Id.* Accordingly,

> [o]fficials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.

*Id.* at 1138; *see also* Cal. Welf. & Inst. Code § 305(a) (requiring that a peace officer have "reasonable cause" for believing a minor is in imminent danger of abuse to take the minor into temporary custody without a warrant).

1.  *Reasonable Cause and Imminent Danger*

Melissa and Farina argue that Foster did not possess information sufficient to provide reasonable cause to believe that B.F. was in imminent danger of serious bodily injury because: (1) B.F. was lying, and (2) even if B.F. could be deemed credible, her statement did not furnish reasonable cause of *imminent* harm. We reject both of these contentions.

**[3]** Police officers must have "specific, articulable evidence . . . that a child is in imminent danger of abuse." *Wallis*, 202 F.3d at 1138. Appellants argue that B.F.'s statement was not "specific, articulable evidence" because she was lying. A victim's report of abuse, however, is compelling evidence. *Mabe v. San Bernadino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1108 (9th Cir. 2001); *cf. Wallis*, 202 F.3d at 1138-39 (finding that officers lacked reasonable cause because the only evidence of abuse was a statement made by an institutionalized, mentally ill patient with an extensive history of severe delusional disorders). Appellants confuse the ultimate truth of B.F.'s claim with whether it was reasonable for Foster to believe her statements at the time she spoke with the officers. No rational jury could conclude that Foster's reliance upon B.F.'s statement was unreasonable.

**[4]** We also reject appellants' argument regarding the imminence of the harm. To take a child into protective custody without a warrant, the officer must have reasonable cause to believe that harm will occur in the period of time it would take to procure a warrant and remove the child from the home. *See Rogers v. County of San Joaquin*, 487 F.3d 1288, 1294-95 (9th Cir. 2007); *see also Mabe*, 237 F.3d at 1108. Here, after interviewing B.F., Foster decided to take her

into protective custody because he believed that she faced imminent harm in light of the sexual abuse and threat of physical harm.

On the question of imminence, we find *Mabe*, 237 F.3d at 1104-05, to be particularly instructive. In *Mabe*, the inappropriate sexual touching, somewhat similar to the conduct in this case, occurred only at night and had not occurred in the month prior to removal of the child. *Id.* In addition, there was a four-day delay between the social worker's interview with the child in the home and the eventual removal. *Id.* During that interview, the social worker obtained all of the information that justified the removal four days later. For the *Mabe* court, the delay, due entirely to the defendant's actions, was a significant indication that the degree of imminence required to justify warrantless removal was absent. *Id.*

**[5]** In the case before us, B.F. reported that David grabbed her breast every couple of days. There was no indication that it was limited to a particular time of day as in *Mabe*. According to B.F., David had last touched her shortly before she ran away with Maciel. Whether Foster reasonably believed that David would grab B.F.'s breast, or otherwise engage in inappropriate and abusive sexual conduct, during the time it would take to procure a warrant and remove B.F. was for a jury to decide.

**[6]** The additional risk of beatings, however, tips the scale and makes clear that summary judgment for Foster was appropriate on this element. Although B.F. stated that she thought she was safe in the home, she also expressed a great deal of concern about whether the Burkes would know that she had reported the abuse. She stated that it would "be worse for her" when she arrived home, that her parents would view her report as an attempt to shift blame, and that her stepfather would "go off." David had already threatened to "beat her ass" if she did not provide Maciel's address. Under the totality of the circumstances, there was reasonable cause to believe

that B.F. was in imminent danger of physical harm, and Foster is entitled to summary judgment as to this element. Notably, unlike in *Mabe*, there was no delay here between the interview with B.F. and Foster's decision to remove her.

### 2. *Scope of the Intrusion*

[7] Even where there is reasonable cause to believe that a child is in imminent danger, the scope and degree of state interference must be justified by the alleged exigency. *Wallis*, 202 F.3d at 1140. Melissa and Farina both argue that moving B.F. into child protective custody that evening—rather than placing her with either of them—was not justified by the threat posed by David. We address their claims separately.

#### a. *Melissa Burke*

Melissa contends that regardless of any threat posed by David, B.F. should not have been removed from her custody.

Melissa relies heavily on *Wallis*, in which we held that triable issues of fact existed regarding the reasonableness of removal from the mother for two months when the mother was in no way implicated in any past or future abuse. 202 F.3d at 1140. We suggested that the children could have been taken with their mother to a shelter or placed under some other form of protective custody with her. *Id.*; *see also Mabe*, 237 F.3d at 1110 (suggesting that removing the abusive parent from the residence may be a reasonable step).

[8] In *Mabe*, however, this circuit found that where the official reasonably believed that the mother was not protecting the child "removal from the mother was reasonably necessary as well." 237 F.3d at 1110. In that case, the non-abusive parent was hostile towards the investigation and refused to believe the child. We concluded that, in such circumstances, it was reasonable to believe that the mother was not protecting the child. *Id.* This case is virtually indistinguishable. Melissa

repeatedly denied abuse and accused B.F. of lying. To the extent that she acknowledged inappropriate conduct, she admitted that David ignored her requests to stop. She also repeatedly blamed B.F. When David hit B.F., she stated that B.F. "deserved it." Removing B.F. from Melissa, who lived with David, was therefore reasonable. *See id.*

### b. *Clifton Farina*

**[9]** The intrusion on Farina's right of familial association presents us with a question of first impression because B.F. did not reside with Farina. In *Brittain v. Hansen*, this circuit recognized that non-custodial parents have a reduced liberty interest in the companionship, care, custody, and management of their children. 451 F.3d 982, 992 (9th Cir. 2006). The "interest is unambiguously lesser in magnitude than that of a parent with full legal custody." *Id.* Although Melissa and Farina shared joint legal custody of B.F., the record indicates that Melissa had sole physical custody. However, even if Farina's interest in B.F.'s companionship was somehow reduced, he was not without *any* interest in the custody and management of B.F. We therefore extend the holding in *Wallis* to parents with legal custody, regardless of whether they also possess physical custody of their children.

**[10]** We note, however, that the test in *Wallis* is flexible and must take into account the individual circumstances. For example, if the parent without physical custody does not reside nearby, and a child is in imminent danger of harm, it is probably reasonable for a police officer to place a child in protective custody without attempting to place the child with the geographically distant parent.

**[11]** We now turn to the facts of this case. Farina was never personally accused of violence. Although appellees intimate that B.F. was not welcome in Farina's home, the officers made no attempt to contact him. They did not explore the possibility of putting B.F. in his care that evening rather than

placing her in government custody. Indeed, Farina was not informed of B.F.'s removal for two days. The reasonableness of the scope of Foster's intrusion upon Farina's rights is for the jury to decide.

### 3.    *Qualified Immunity*

**[12]** Having determined that Farina has raised a triable issue of fact as to whether Foster's failure to contact him violated his constitutional right of familial association, we turn to the question of qualified immunity.

**[13]** "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 129 S. Ct. at 815. "To be clearly established, the law must be sufficiently clear that a *reasonable official would understand that what he is doing violates that right.*" *Trevino v. Gates*, 99 F.3d 911, 917 (9th Cir. 1996) (internal citation omitted).

We now expressly extend our holding in *Wallis*, 202 F.3d at 1138, to parents with only legal custody. Although officers cannot be "expected to predict the future course of constitutional law," *Wilson v. Layne*, 526 U.S. 603, 617 (1999) (internal quotations and marks omitted), it is not necessary that the alleged act be "previously declared unconstitutional," *Trevino*, 99 F.3d at 917. We must therefore determine whether the unlawfulness was "apparent in light of preexisting law." *Id.*

**[14]** *Wallis* referred only to the removal of a child from "the custody of its parent." 202 F.3d at 1138; *see also Mabe*, 237 F.3d at 1106. We never defined the type of custody, and custody is commonly thought of as referring only to "physical" custody. Indeed, in *Rogers*, we referred to the officers' ability to "remove a child from *the home*." 487 F.3d at 1294,

1297 (emphasis added). Against this legal backdrop, we cannot say that failing to contact Farina, who did not have physical custody of B.F., was clearly unlawful. Accordingly, Foster is entitled to immunity, and we affirm the grant of summary judgment in his favor.

## B.   42 U.S.C. § 1983 CLAIM AGAINST THE COUNTY OF ALAMEDA

Finally, Melissa and Farina seek to establish the County's liability for its alleged failure to train its police officers regarding protective custody warrants.

[15] A municipality may be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To establish municipal liability under § 1983, a plaintiff "must show that (1) she was deprived of a constitutional right; (2) the County had a policy; (3) the policy amounted to a deliberate indifference to her constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Mabe*, 237 F.3d at 1110-11 (internal quotation marks omitted).

[16] The district court granted summary judgment on this claim because it found that there had been no constitutional deprivation. Although we agree with the district court for the most part, Farina has raised a triable issue of fact as to whether Foster's failure to contact him violated his constitutional right of familial association. We affirm the grant of summary judgment as to Foster only because he is entitled to immunity. Because local government units are not entitled to the qualified-immunity defense, *Hervey v. Estes*, 65 F.3d 784, 791 (9th Cir. 1995), we vacate the district court's judgment as to County's liability and remand so that the district court can examine the other elements of the *Monell* claim in the first instance.

## *IV. CONCLUSION*

For the foregoing reasons, we AFFIRM the grant of summary judgment with respect to the § 1983 claim against Foster and we VACATE the grant of summary judgment with respect to the *Monell* claim against the County of Alameda. Each side to bear their own costs on appeal.

**AFFIRMED IN PART; VACATED IN PART; REMANDED FOR FURTHER PROCEEDINGS**