**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANIEL JAMES,
            *Plaintiff-Appellant,*

v.

BOBBIE ROWLANDS; STEVEN TRIPP;
VIVIAN VAUGHT,
            *Defendants-Appellees.*

No. 08-16642

D.C. No.
2:06-CV-00967-
GEB-DAD

DANIEL JAMES,
            *Plaintiff-Appellee,*

v.

BOBBIE ROWLANDS; STEVEN TRIPP;
VIVIAN VAUGHT,
            *Defendants-Appellants.*

No. 08-16643

D.C. No.
2:06-CV-00967-
GEB-DAD

OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, District Judge, Presiding

Argued and Submitted
October 5, 2009—San Francisco, California

Filed May 26, 2010

Before: Procter Hug, Jr. and Richard A. Paez,
Circuit Judges, and George H. Wu,* District Judge.

*The Honorable George H. Wu, United States District Judge for the
Central District of California, sitting by designation.

7509

Opinion by Judge Paez

## COUNSEL

Anthony T. Caso, Sacramento, California, for plaintiff-appellant-cross-appellee Daniel James.

Robert Shulman, County Counsel, and Michael S. Jamison, Deputy, Office of the Nevada County Counsel, Nevada City, California, for defendants-appellees-cross-appellants Bobby Rowlands, Steven Tripp, and Vivian Vaught.

## OPINION

PAEZ, Circuit Judge:

The Fourteenth Amendment protects parents' fundamental right to participate in the care, custody, and management of their children. *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981). This right extends to parents who, like the plaintiff here, have shared legal custody but lack physical custody of their children. *See Brittain v. Hansen*, 451 F.3d 982, 992 (9th Cir. 2006). In this case, we are asked to determine the circumstances under which the Fourteenth Amendment requires public officials to inform a parent with only joint legal custody about actions they take involving the parent's child.

Plaintiff Daniel James brought this action under 42 U.S.C. § 1983 alleging that the defendants—two social workers from

the Nevada County Child Protective Services Agency
("CPS") and a deputy sheriff—violated his substantive and
procedural due process rights under the Fourteenth Amend-
ment by failing to notify him of their investigation into allega-
tions that his daughter, C.J., had been molested and that
someone had coerced her to change her testimony in the trial
that followed. In addition, James contends that the two social
worker defendants violated his rights by failing to inform him
of events stemming from the molestation investigation: (1) a
decision to detain C.J. temporarily and to take her into protec-
tive custody, and (2) a voluntary agreement with C.J.'s
mother, who had physical custody, to place C.J. with her
maternal grandmother for the duration of the molestation trial.
We conclude that the defendants are entitled to qualified
immunity on these claims and accordingly affirm the grant of
summary judgment.

First, we decline to decide whether James had a constitu-
tional right to be informed of the molestation investigation or
of the attempts to coerce C.J. to change her testimony. We
conclude that, even if such rights existed, they were not
clearly established. We therefore affirm the grant of qualified
immunity on these two claims. Second, we hold that the CPS
officials violated James's substantive due process right to par-
ticipate in the care, custody, and management of his daughter
by failing to notify him of her detention and placement in
temporary protective custody and of the subsequent agree-
ment transferring her physical custody for the duration of the
molestation trial. We conclude, however, that James's right to
this information was not clearly established and that the offi-
cials are therefore entitled to qualified immunity on these
claims. Finally, we hold that the CPS officials did not violate
James's procedural due process rights and accordingly affirm
the grant of qualified immunity on that claim.

## I.   Background

Daniel James and Gail Sherman are the biological parents
of C.J., who was a minor at the time of the events relevant to

this case. James and Sherman, who were never married, shared joint legal custody of C.J., but Sherman had sole physical custody. C.J. lived with Sherman and Sherman's live-in boyfriend, Shawn Blair, and James had visitation rights two weekends per month. In late February 2003, C.J. told her maternal grandmother, Nancy Proano, that Blair's father had sexually molested her. Proano reported this to CPS, which, in turn, reported the allegations to the Nevada County Sheriff's Office.

On March 18, 2003, defendant Bobbie Rowlands, a CPS social worker, interviewed C.J. at the Nevada County Sheriff's Office. Defendant Steve Tripp, a Nevada County deputy sheriff who was investigating the matter for the Sheriff's Office, monitored the interview from another room. After the interview, Rowlands told Sherman she had to prevent Blair's father from having any further contact with C.J. Because Sherman agreed to prevent further contact, and because Blair's father did not live in C.J.'s household, CPS did not file a juvenile dependency action to protect C.J. The Nevada County District Attorney later filed criminal charges against Blair's father.

In late July, on the same day as the preliminary examination in Blair's father's criminal case, C.J. told her tutor that Blair had struck her and her mother. C.J.'s step-grandfather, Robert Proano, reported this to Rowlands, who informed Tripp. At Tripp's request, Rowlands referred the matter to the Grass Valley Police Department for investigation because the alleged assault occurred in its jurisdiction. The next day, a Grass Valley police officer who is not a party in this suit interviewed C.J. and her mother about this allegation. C.J. confirmed that Blair had hit her but denied that he had pressured her to change her testimony against his father.

On September 10, 2003, Rowlands learned that C.J. had told her tutor that Blair was pressuring C.J. to change her testimony. The next day, Rowlands interviewed C.J. at her

school, and C.J. reported that Blair had told her to change her testimony. At Rowlands's urging, Sherman agreed to let C.J. stay with Proano that night. The next day, a Grass Valley police officer talked to C.J. at school, and she again confirmed that Blair was pressuring her to change her testimony. The officer detained C.J. at school, and a supervising social worker, defendant Vivian Vaught, instructed another social worker to take C.J. into protective custody and to bring her to Proano's home. The social worker told Sherman that CPS had taken C.J. into custody and placed her with Proano.

Three days later, on September 15, 2003, Rowlands met with Sherman and gave her five options for ensuring C.J.'s safety during the molestation trial: make Blair leave the home so that C.J. could remain there; allow C.J. to live with Proano without any CPS involvement; sign a voluntary agreement with CPS to place C.J. with Proano; sign a voluntary agreement to place C.J. in a foster home; or let C.J. live with her father, James. After Sherman refused all options, Vaught intervened. Sherman ultimately agreed to sign a voluntary agreement with CPS transferring C.J.'s physical custody to Proano until the molestation trial was over. CPS did not interrupt James's visitation during this period.

In early December 2003, C.J. told James that Blair's father had molested her. In response, James filed a motion in the Placer County Superior Court seeking physical custody of C.J. On December 12, 2003, in an *ex parte* proceeding, the court awarded temporary physical custody to James pending a custody hearing. After the custody hearing, in May 2005, the court awarded sole legal and physical custody to Proano.

In February 2005, on the basis of these events, James filed a pro se complaint in the district court against Rowlands, Vaught, and other defendants not named in this case. After James failed to explicitly assert grounds for federal jurisdiction in his response to an order to show cause, the district court dismissed his suit for lack of subject matter jurisdiction.

James then hired an attorney who filed this action in May 2006 against Rowlands, Vaught, and Tripp in the Eastern District of California, seeking damages under § 1983 for violations of his Fourteenth Amendment rights to substantive and procedural due process and to equal protection. The complaint alleged that the defendants violated James's rights by failing to inform him of the molestation investigation. His subsequent filings made clear that he challenged not only the failure to inform him of the investigation, but also the failure to notify him of the reported attempts to coerce C.J. to change her testimony and of the changes in C.J.'s physical custody. The defendants moved for summary judgement on the grounds of qualified immunity and James's alleged failure to comply with the statute of limitations.

The district court granted summary judgment to the defendants on all claims. The district court concluded that the defendants' failure to inform James of the investigation and C.J.'s temporary placement with Proano violated his substantive due process right "to make decisions about the care, custody and control of his daughter." The district court further determined that James's rights were clearly established "on the basis of common sense," but that the defendants were nonetheless entitled to qualified immunity because they made a reasonable mistake about what the law required. In addition, the district court held that the defendants did not violate James's right to procedural due process, and that James did not present enough evidence to raise a triable issue of fact on his equal protection claim. Because the district court granted summary judgment to the defendants on the merits, it did not address whether James's suit was barred by the statute of limitations. James timely appealed, and the defendants cross-appealed on the statute of limitations issue. Because James did not brief his equal protection claim on appeal, we deem it waived and decline to consider it here. *See Greene v. Camreta*, 588 F.3d 1011, 1020 n.4 (9th Cir. 2009).

## II.   Standard of Review

We review de novo the grant of summary judgment on the ground of qualified immunity. *McSherry v. City of Long Beach*, 584 F.3d 1129, 1134 (9th Cir. 2009). We view the evidence in the light most favorable to the non-moving party, James. *Id.* at 1135.

## III.   Discussion

An official is entitled to summary judgment on the ground of qualified immunity where his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Until recently, courts considering an official claim of qualified immunity followed the two-step protocol established in *Saucier v. Katz*, 533 U.S. 194 (2001), which required us first to determine whether the defendant violated a constitutional right and then to determine whether that right was clearly established. *See Pearson v. Callahan*, 555 U.S. ___, 129 S. Ct. 808, 818 (2009) (overturning *Saucier* in part). In *Pearson v. Callahan*, the Supreme Court reversed this earlier rule and gave courts discretion to grant qualified immunity on the basis of the "clearly established" prong alone, without deciding in the first instance whether any right had been violated. *Id.* Thus, we may grant qualified immunity if "the facts that a plaintiff has alleged or shown [do not] make out a violation of a constitutional right" or if "the right at issue was [not] 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 816, 818 (internal citations omitted).

The defendants contend that they are entitled to qualified immunity on James's substantive and procedural due process claims both because they did not violate his rights and because those rights, if violated, were not clearly established. We address James's substantive and procedural due process claims in turn.

## A. Substantive Due Process

[1] The Fourteenth Amendment's Due Process Clause protects parents' well-established liberty interest in the "companionship, care, custody, and management of [their] children." *Lassiter*, 452 U.S. at 27 (noting that the importance of this right is "plain beyond the need for multiple citation") (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)); *accord Troxel v. Granville*, 530 U.S. 57, 65 (2000) (describing this liberty interest as "perhaps the oldest of the fundamental liberty interests recognized by this Court"). This right is not reserved for parents with full legal and physical custody. To the contrary, we have recognized that parents with even fewer custody rights than James—parents with no legal or physical custody, but merely visitation rights—have "a liberty interest in the companionship, care, custody, and management of their children," even though such a parent's right is "unambiguously lesser in magnitude than that of a parent with full legal custody." *Brittain*, 451 F.3d at 992. James therefore has a protected liberty interest in participating in C.J.'s "care, custody, and management."

James contends that the defendants deprived him of this protected liberty interest, and thus violated his substantive due process rights, by failing to inform him of (1) the molestation investigation, (2) Blair's attempt to coerce C.J. into changing her testimony, (3) C.J.'s detention and placement in protective custody, and (4) the voluntary agreement temporarily transferring C.J.'s physical custody to Proano.[1] The defendants con-

---

[1] James alleges that the defendants not only failed to inform him of these events, but also affirmatively concealed them by instructing Proano not to tell him anything. The record, however, does not contain any evidence from which a reasonable jury could conclude that any defendant instructed Proano to keep the investigation and related events secret from James. The declaration by Proano that James points to in support of his allegation states only that Proano decided not to tell James about the abuse allegations "after consultation with the Nevada County Child Protective Ser-

tend that their failure to notify James of these events did not violate his rights and that, even if it did, they are nonetheless entitled to qualified immunity because those rights were not clearly established. We address each claimed violation in turn.

### 1.  Failure to notify James about the molestation investigation

**[2]** First, James contends that the defendants' failure to notify him of the molestation investigation violated his constitutional rights. In support of this claim, James points to no authority establishing that any parent—even a parent with full legal and physical custody—has a constitutional right to be informed when officials investigate allegations that his or her child has been molested. Instead, James argues only that, without such information, a parent's liberty interest in participating in a child's care and management would be "little more than a hollow promise." Exercising our discretion under *Pearson*, we decline to decide here whether parents have such a right, and whether officials have a correlative constitutional duty to notify a minor's parent when they investigate allegations that the minor has been molested.[2] Instead, we affirm the

---

vices who felt that it was not necessary to advise Mr. James . . . ." Telling Proano that it was "not necessary" to tell James is not tantamount to instructing her not to tell him. James also bases his allegation of affirmative concealment on a declaration by C.J.'s attorney, which recounts conversations she had with Proano and her husband. This declaration, however, establishes only that the Proanos offered two explanations for not telling James: the defendants told them that advising James was "not necessary," and they feared a violent reaction from him. These statements, of course, do not show that the defendants instructed anyone to withhold information from James. Because James has presented insufficient evidence that any defendant instructed anyone to conceal information from him, we address only the claim that the officials' failure to notify him of these events violated his constitutional rights.

[2]We note, however, that officials do have a duty to notify parents when an abuse investigation involves a medical examination. *See Greene*, 588

grant of summary judgment for the defendants on the ground that such a right, if it exists, was not clearly established at the time of the events in question.

A right is clearly established if the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 US. 635, 640 (1987)). Although a parent's right to participate in his child's care, custody, and management is clearly established "as a broad general proposition," what that right means "in light of the specific context" here is not clearly established. *Id.* at 201. Indeed, we are aware of no case with even loosely analogous facts that might suggest that officials investigating allegations of child abuse have a constitutional duty to inform the alleged victim's parents.

**[3]** Contrary to the district court's conclusion, we hold that any right that James may have was not clearly established on the basis of "common sense." A right can be clearly established by "common sense" only where "conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional." *DeBoer v. Pennington*, 206 F.3d 857, 864-65 (9th Cir. 2000), *vacated on other grounds by Bellingham v. DeBoer*, 532 U.S. 992 (2001) (internal quotation marks and citation omitted). Failing to inform a parent of an investigation into possible abuse of his or her child does not

F.3d at 1036; *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000). The officials did not refer C.J. for any such examination here, however. In addition, officials must in some circumstances notify parents when they detain a suspected child abuse victim for questioning. We have previously held that seizing and interrogating a suspected child abuse victim without parental consent violates the child's Fourth Amendment rights unless the seizure is authorized by a warrant or court order or justified by exigent circumstances. *Greene*, 588 F.3d at 1030. No Fourth Amendment claim is presented in this case.

rise to this level. Because any right that James may have had to be informed of the investigation into C.J.'s molestation was not clearly established, the defendants are entitled to qualified immunity on this claim.

2.   *Failure to notify James about attempts to coerce C.J. to change her testimony*

Second, James contends that the defendants violated his rights by failing to notify him of the investigation into Blair's alleged attempts to coerce C.J. to change her testimony. Again, James points to no authority suggesting that state actors such as the defendants here have a constitutional duty to inform a minor's parent of such allegations, or more generally of allegations that someone is mistreating the child. We decline to decide here whether or under what circumstances parents have a right to such information. Instead, we affirm the grant of qualified immunity to the defendants on this claim because such a right, if it exists, was not clearly established.

3.   *Failure to notify James of C.J.'s detention and placement in protective custody*

Third, James contends that the CPS officials' failure to inform him that they temporarily detained C.J. and then placed her in protective custody deprived him of his right to participate in C.J.'s care and management. In September 2003, a police officer detained C.J. at school, and CPS assumed temporary custody of her and placed her with Proano over the weekend.[3] Viewing the evidence in the light most

---

[3]We note that James does not allege that defendant Tripp in any way participated in the decision to detain C.J. or to take her into protective custody. We therefore construe James's claim to allege only that the CPS defendants, Rowlands and Vaught, violated his right to notification of this decision. Of course, § 1983 imposes liability on a defendant only if he or she personally participated in or directed a violation. *Taylor v. List*, 880

favorable to James, a reasonable jury could find that taking these actions without informing James violated his constitutional rights.

**[4]** We have recognized that the Fourteenth Amendment's protection of parental rights prohibits the state from separating parents from their children "without due process of law except in an emergency." *Wallis*, 202 F.3d at 1136. We have accordingly held that:

> Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.

*Id.* at 1138. Recently, in *Burke v. County of Alameda*, we extended this rule to protect not only parents with full custody, but also parents like James who have only joint legal custody and no physical custody. 586 F.3d 725, 733 (9th Cir. 2009).

**[5]** In *Burke*, officials took a child into protective custody and did not inform the father, who had only joint legal custody, for two days. *Id.* We held that the officials had reasonable cause to believe that the child was in imminent danger, but that the officials may have violated the father's rights because the "scope of the intrusion" may have been greater than necessary to avert the danger to the child. *Id.* at 732-33.

F.2d 1040, 1045 (9th Cir. 1989). The record here is unclear as to whether both Rowlands and Vaught participated in the decision to detain C.J. and to take her into protective custody. However, because we conclude that the CPS officials are entitled to qualified immunity on this claim, we do not attempt to determine which official participated in—and therefore could face liability for—this alleged violation.

Specifically, although the need to protect the child justified taking some action, it may not have justified failing to inform the father or to "explore the possibility of putting [the child] in his care" instead. *Id.* at 733. Thus, we held that a jury would have to decide whether "the scope of [this] intrusion on [the father's] rights" was reasonable. *Id.* In other words, unless the danger to the child made it reasonably necessary to take the child into state custody without giving the father the opportunity to take the child, the officials violated the father's rights by not giving him that opportunity.

**[6]** Similarly, here, a reasonable jury could find that the CPS officials violated James's rights by taking C.J. into protective custody and placing her with her grandmother without notifying him or giving him the opportunity to take C.J. into his care. Even if C.J.'s reports that Blair had hit her and that he was pressuring her to change her testimony gave the CPS officials reasonable cause to believe that C.J. was in imminent danger, it is not clear that "the scope of the intrusion [was] reasonably necessary to avert" the possible injury to C.J. *Id.* at 731 (quoting *Wallis*, 202 F.3d at 1138). On the factual record, a jury could conclude that the CPS officials' failure to notify James that they were taking C.J. into protective custody was not "reasonably necessary" to avert any danger to C.J. and that the CPS officials therefore violated James's rights. To be sure, the officials may have had good reason not to tell James: C.J. had expressed fear of him, and there had been an earlier substantiated report that James had physically abused her. But it would be for a jury to decide whether these facts justified placing C.J. with Proano without notifying James or giving him the opportunity to assume care of C.J. Thus, James's allegations, taken as true, establish that the CPS officials violated his constitutional rights.

**[7]** Nonetheless, the defendants are entitled to qualified immunity on this claim. *Burke* extended for the first time *Wallis*'s rule to protect parents without physical custody. *Id.* at 734. *Burke* recognized that, before it addressed the issue,

it was not clearly established that detaining a child without notifying a parent who had only shared legal custody would violate that parent's constitutional rights. *Id.* Because James's rights were therefore not clearly established in 2003, the time of the relevant events here, the defendants are entitled to qualified immunity on this claim.

4. *Failure to notify James of the temporary transfer of C.J.'s physical custody pursuant to a voluntary agreement*

Finally, James contends that the CPS officials' failure to inform him that they had entered into a voluntary agreement with Sherman to temporarily transfer C.J.'s physical custody to Proano also deprived him of his parental rights under the Fourteenth Amendment.[4] We agree.

[8] In *Burke*, we recognized that interfering with a child's physical custody can violate the rights of a parent with shared legal custody, even if that parent has no physical custody. *See Burke*, 586 F.3d at 733. We see no reason to distinguish the situation in *Burke*, where officials unilaterally assumed temporary protective custody of a child, from a situation like that here, where CPS officials encourage and facilitate a temporary transfer of a child's physical custody pursuant to a voluntary agreement with one parent. In both cases, officials take part in changing a child's physical custody. It is the change in custody itself, not the manner in which the change occurs, that interferes with the parent's right to participate in his child's care and management. Without notice of such a change in custody, a parent has no opportunity to exercise that right.[5]

---

[4]Again, because James does not allege that Tripp participated in this agreement in any way, we construe this claim to allege violations only by the CPS defendants, Rowlands and Vaught.

[5]We do not mean to suggest that, under *Burke*, officials must give a parent with shared legal custody the opportunity to assume the care of a child whenever they participate in transferring a child's physical custody.

**[9]** The defendants suggest that notice would not actually give a parent like James the opportunity to exercise his parental rights because he could not veto the temporary change in custody. This, however, ignores the fact that such a parent could exercise his right to participate in his child's care and management in other ways, such as by talking to the child about the move or petitioning a court for physical custody. Thus, failing to notify a parent of a change in his child's physical custody meaningfully impairs his right to participate in the child's care and management.

**[10]** We therefore hold that the Fourteenth Amendment's protection of parents' rights requires officials to notify a parent with shared legal custody of a transfer in a minor's physical custody when the officials have encouraged and facilitated that transfer. To be sure, this requirement is not without qualification. As *Wallis* recognized, some circumstances may justify taking action without notifying a child's parent. *See Wallis*, 202 F.3d at 1138. In *Wallis*, we held that officials may take a minor into protective custody without a court order when "the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Id.* Following *Wallis*'s example, we hold that public officials may encourage and facilitate a transfer of a minor's physical custody without notifying a parent with shared legal custody only if they have reasonable cause to believe that such notification would put the child in imminent danger of serious bodily injury.

---

Rather, *Burke* requires officials to offer such an opportunity only when the officials make a *unilateral* decision, without a parent's consent, to take the child into protective custody. When the officials merely encourage and facilitate a transfer of a child's physical custody pursuant to a voluntary agreement with the parent with physical and legal custody, the officials need only inform the other parent of the transfer.

Here, Rowlands and Vaught encouraged and facilitated the transfer of C.J.'s physical custody. They required Sherman to choose one of several options for where to place C.J. for the duration of the molestation trial. After some initial resistance, Sherman chose to enter into a voluntary agreement with CPS to place C.J. with Proano. Formally, this agreement authorized CPS to assume temporary custody of C.J., and CPS placed C.J. with Proano pursuant to this authority. Sherman did not independently decide to place her daughter with Proano. Nor did the CPS officials passively watch while Sherman temporarily placed her daughter with Proano. Rather, they encouraged and endorsed the transfer of custody, and indeed effectuated it.

**[11]** Because Rowlands and Vaught encouraged and facilitated the transfer of C.J.'s custody, the Fourteenth Amendment required them to notify James of the transfer unless they had reasonable cause to believe that notifying him would have put C.J. in imminent danger of serious injury. Taking the evidence in the light most favorable to James, there is no basis to conclude that notifying James of the transfer would have created any such risk. Accordingly, the factual submissions establish that the CPS officials' failure to notify James deprived him of his right to participate in his daughter's care, custody, and management.

**[12]** The defendants are nonetheless entitled to qualified immunity on this claim. As discussed above, *Burke*, decided in 2009, was the first case in this circuit to establish that interfering with a child's physical custody can violate the rights of a parent who does not have physical custody. *Burke*, 586 F.3d at 734. Failing to contact James about the voluntary agreement was therefore not clearly unlawful at the time, and the CPS defendants are entitled to summary judgment on this claim.

## B. Procedural Due Process

James also alleges that the CPS officials violated his procedural due process rights by failing to notify him when they

took C.J. into temporary custody and when they entered into the voluntary agreement to temporarily transfer C.J's custody to Proano. Specifically, James contends that California Welfare and Institutions Code sections 307.4 and 11400 required the CPS officials to notify him of these actions, and that the failure to comply with these statutes violated his right to procedural due process.

**[13]** California Welfare and Institutions Code section 307.4 requires any official who takes a minor into temporary custody to "immediately inform, through the most efficient means available, the parent, guardian, or responsible relative, that the minor has been taken into protective custody . . . ." Cal. Welf. & Inst. Code § 307.4(a). According to James, this requires notice to both parents, notwithstanding the use of the singular form of "parent." James also argues that California Welfare and Institutions Code section 11400, which defines a "voluntary placement agreement" as a "written agreement between . . . the county welfare department . . . and the parents or guardians of a child," required the officials to notify him of the placement agreement. *Id.* § 11400(p). We need not decide whether these state laws in fact required notice to James at any point. Even assuming that these statutes did require the CPS officials to notify James, they did not create a right protected by the Fourteenth Amendment's Due Process Clause that James can vindicate through a § 1983 civil rights action.

**[14]** State law can create a right that the Due Process Clause will protect only if the state law contains "(1) substantive predicates governing official decisionmaking, and (2) explicitly mandatory language specifying the outcome that must be reached if the substantive predicates have been met." *Bonin v. Calderon*, 59 F.3d 815, 842 (9th Cir. 1995) (internal quotation marks and citation omitted). To create a right protected by the Due Process Clause, the state law "must provide more than merely procedure; it must protect some substantive end." *Id.* (internal quotation marks and citation omitted);

*accord Olim v. Wakinekona*, 461 U.S. 238, 250 n.12 (1983) ("[A]n expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause."). The California statutes that James contends required the officials to notify him do not, even under James's construction, establish any substantive predicates or mandate any outcomes. At most, they simply require notice.

James contends that the failure to follow these purported notification requirements nonetheless violated his procedural due process rights because the requirements are designed to protect parents' constitutionally protected liberty interest in participating in the care and management of their children. This argument misapprehends how the Due Process Clause interacts with state law. A state does not create new constitutional rights by enacting laws designed to protect existing constitutional rights. *See Bonin*, 59 F.3d at 842 (explaining that a state law does not create a protected liberty interest where it "merely creates a state procedural right which is itself designed to facilitate the protection of more fundamental substantive rights" arising from the Constitution, such as the right to effective assistance of counsel). Thus, when a state establishes procedures to protect a liberty interest that arises from the Constitution itself—like a parent's liberty interest here—the state does not thereby create a new constitutional right to those procedures themselves, and non-compliance with those procedures does not necessarily violate the Due Process Clause. *See Walker v. Sumner*, 14 F.3d 1415, 1420 (9th Cir. 1994) ("[I]f state procedures rise above the floor set by the due process clause, a state could fail to follow its own procedures yet still provide sufficient process to survive constitutional scrutiny." (quoting *Rogers v. Okin*, 738 F.2d 1, 8 (1st Cir. 1984))), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). Rather, the Due Process Clause itself determines what process is due before the state may deprive someone of a protected liberty interest. *See Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976) (setting

forth the factors used in determining whether procedural protections are adequate under the Due Process Clause).

**[15]** Because the state statutes that James identifies did not create a constitutional right to notification, James's procedural due process claim fails. We accordingly affirm the grant of summary judgment to the defendants on James's procedural due process claim.

## IV.   Conclusion

In sum, we decline to decide whether the defendants violated James's substantive due process rights by failing to inform him of the molestation investigation or the attempts to coerce C.J. to change her testimony and conclude that, if any such rights existed, they were not clearly established. We further hold that, although the CPS officials violated James's parental rights under the Fourteenth Amendment by failing to inform him of C.J.'s temporary detention and placement in protective custody and of the voluntary agreement temporarily transferring her physical custody, those rights were not clearly established at the time. We therefore affirm the grant of summary judgment for the defendants on James's substantive due process claims. Finally, we hold that no state law conferred on James a procedural due process right to notification of the changes in C.J.'s custody, and we accordingly affirm the grant of summary judgment for the defendants on James's procedural due process claim. Because we affirm the grant of summary judgment for the defendants, we dismiss as moot the defendants' cross-appeal on the statute of limitations issue.

**Appeal No. 08-16642: AFFIRMED.**

**Appeal No. 08-16643: DISMISSED.**