**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

JAMIE KIRKPATRICK, individually, and as the natural father and legal guardian of B.W., a minor,
*Plaintiff-Appellant*,

v.

COUNTY OF WASHOE; AMY REYNOLDS, WCDSS social worker; ELLEN WILCOX, WCDSS social worker; LINDA KENNEDY, WCDSS social worker,
*Defendants-Appellees.*

No. 12-15080

D.C. No.
3:09-cv-00600-ECR-VPC

OPINION

---

Appeal from the United States District Court
for the District of Nevada
Edward C. Reed, Jr., District Judge, Presiding

Argued and Submitted En Banc June 22, 2016
San Francisco, California

Filed December 9, 2016

Before: Sidney R. Thomas, Chief Judge, and Alex Kozinski, Diarmuid F. O'Scannlain, Ronald M. Gould, Johnnie B. Rawlinson, Carlos T. Bea, Mary H. Murguia, Morgan B. Christen, Paul J. Watford, Andrew D. Hurwitz, and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Murguia;
Concurrence by Judge Christen;
Partial Concurrence and Partial Dissent by
Judge Friedland;
Dissent by Judge Kozinski

## SUMMARY[*]

### Civil Rights

The en banc court affirmed in part and reversed in part the district court's summary judgment and remanded in a 42 U.S.C. § 1983 action against the County of Washoe and County social workers alleging violations of the Fourth and Fourteenth Amendment arising from the warrantless removal of plaintiff's biological two-day old daughter from the custody of her mother.

The en banc court affirmed the district court's grant of summary judgment to the defendants on plaintiff's claim that they violated his Fourteenth Amendment rights by seizing the child without due process because plaintiff had no enforceable parental rights at the time of her removal.

The en banc court affirmed the district court's grant of summary judgment to the social workers on the daughter's Fourth Amendment claim. Although the social workers should have obtained a warrant, their constitutional obligation

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to do so was not clearly established, and they were therefore entitled to qualified immunity on this claim.

The en banc court reversed the district court's summary judgment and remanded on the daughter's claim against Washoe County because plaintiff presented sufficient evidence to raise a genuine issue of material fact regarding whether the County maintained a policy of unconstitutionally seizing children in non-exigent circumstances.

Concurring, Judge Christen, joined by Judge Hurwitz, agreed with the results reached by the majority but wrote separately to address what the court described as the unlikely possibility that the child's mother might unexpectedly abscond with the child.

Concurring in part and dissenting in part, Judge Friedland, joined by Chief Judge Thomas, agreed with the majority's opinion as to municipal liability but dissented from its affirmance of summary judgment on the claim against the individual defendants. In Judge Friedland's view, qualified immunity should be denied and summary judgment entered for plaintiff on the Fourth Amendment claim.

Dissenting in part, Judge Kozinski, joined by Judges O'Scannlain, Rawlinson and Bea, and by Judge Watford with respect to Part 2, agreed that the social workers were entitled to qualified immunity and joined that part of the opinion. But Judge Kozinski could not agree that the social workers committed a constitutional violation, nor that the County could be liable for a policy of unconstitutional conduct under *Monell v. Dep't of Soc. Servs. of N.Y.*

**COUNSEL**

David J. Beauvais (argued), Oakland, California; Jeffrey Friedman (argued) and William R. Kendall, Reno, Nevada; for Plaintiff-Appellant.

Herbert B. Kaplan (argued), Deputy District Attorney; Richard A. Gammick, District Attorney; Reno, Nevada; for Defendant-Appellee County of Washoe.

Brian M. Brown (argued) and Kevin A. Pick, Thorndal Armstrong Delk Balkenbush & Eisinger, Reno, Nevada, for Defendants-Appellees Amy Reynolds, Ellen Wilcox, and Linda Kennedy.

---

**OPINION**

MURGUIA, Circuit Judge:

This appeal arises from Washoe County social workers' warrantless removal of a two-day-old child from the custody of her mother, who had a history of drug abuse and whose two other children had been previously placed in the care of the Washoe County Department of Social Services ("DSS"). The biological father subsequently brought suit under 42 U.S.C. § 1983 against the social workers and the County, claiming the removal of his daughter violated the Fourth and Fourteenth Amendments. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part the district court's grant of summary judgment in the defendants' favor, reverse in part, and remand for further proceedings.

## BACKGROUND

The following facts are not in dispute. On July 15, 2008, Rachel Whitworth gave birth to a daughter, B.W.,[1] via cesarean section at a hospital in Reno, Nevada. B.W. was born five weeks premature. Whitworth admitted to nursing staff that she used methamphetamine throughout her pregnancy, including as recently as two days prior. B.W. tested positive for methamphetamine at birth. At the time, Whitworth was unemployed and living with a friend. She had recently self-admitted to a drug rehabilitation program but left after three days.

Whitworth informed the hospital that she had two other children who were already in the custody of DSS, and volunteered the name of the social worker managing their case, Chondra Ithurralde. After B.W. was born, the hospital contacted Ithurralde, who noted that a permanent plan to terminate Whitworth's parental rights for her other children had been approved by a court due to her failure to comply with the DSS case plan, her lack of appropriate housing, and her demonstrated inability to care for her children. Ithurralde also advised placing a protective hold on B.W. to prevent her from being discharged. The hospital typically honors DSS hold requests as a courtesy, but it is not legally obligated to do so. The hold did not prevent Whitworth from interacting with B.W. while they were in the hospital together. B.W. remained in the room with Whitworth, who failed to feed the infant on schedule and to change her diapers.

---

[1] The Court refers to B.W., a minor, only by her initials to protect her privacy.

The next day, Ithurralde visited the hospital with DSS social worker Ellen Wilcox. Wilcox interviewed Whitworth, and informed her of the hold and that a protective custody hearing had been scheduled for the following day. Until the hearing, DSS planned to place B.W. in the same foster home as her two half-siblings. Wilcox's supervisor, Linda Kennedy, directed Wilcox to take B.W. when the hospital released her. On July 17, 2008, the hospital discharged two-day-old B.W. into DSS's care. DSS did not attempt to obtain a warrant before assuming custody of B.W.

On July 18, the family division of Nevada's Second Judicial District Court held a protective custody hearing at which Whitworth participated by phone from the hospital. The court determined that B.W. should remain in protective custody due to Whitworth's ongoing drug use, finding reasonable cause to believe that continuation in Whitworth's care was contrary to B.W.'s welfare. Following the hearing, Whitworth made no contact with her attorney or DSS. On July 28, 2008, DSS filed a petition alleging that B.W. was a child in need of protection. Whitworth failed to attend any of the subsequent adjudicatory or dispositional hearings. DSS attempted to locate Whitworth but was unable to find her.

Plaintiff-Appellant Jamie Kirkpatrick was present at the hospital when Whitworth gave birth to B.W., although he did not know at the time whether he was B.W.'s biological father, nor did he sign an affidavit of paternity. Kirkpatrick first learned of DSS's involvement soon after Wilcox took custody of B.W. on July 17, 2008. He left his contact information with Wilcox for the purpose of scheduling a paternity test to determine whether he was B.W.'s biological father. Kirkpatrick also advised DSS that he was moving to Elko, Nevada. Kirkpatrick did not attend the protective custody

hearing on July 18, 2008, but the court ordered a paternity test at his request. The test revealed that Kirkpatrick is indeed B.W.'s biological father.

Kirkpatrick visited B.W. twice in the Fall of 2008, and expressed an interest in reunification at a six-month permanency hearing held in January 2009. After the hearing, Kirkpatrick returned to Reno and began visiting B.W. more frequently. He continued to maintain his visits, employment, and housing over the next year. In June 2009, B.W.'s foster family determined that they were no longer able to care for B.W. and her half-siblings, and the children were transferred to a different foster home. Kirkpatrick became concerned about B.W.'s care there, and after an incident during which B.W. suffered a large bruise on her forehead Kirkpatrick began advocating more strongly that B.W. should be placed with him. On December 31, 2009, B.W. was reunified with Kirkpatrick.

In October 2009, Kirkpatrick brought suit under 42 U.S.C. § 1983 against Washoe County and DSS workers Ellen Wilcox, Linda Kennedy, and Amy Reynolds—another supervisor—for removing B.W. from Whitworth without a warrant. In the operative complaint—the Second Amended Complaint ("SAC")—Kirkpatrick alleged one cause of action against the social-worker defendants and another cause of action against the County, both on behalf of "Plaintiff," in the singular. The SAC also stated that "Plaintiff is the father and legal guardian of the minor child, [B.W.]," and requested damages because "[B.W.'s] constitutional right to be with her parents was violated."

The district court granted the defendants' motion for summary judgment. The district court first determined that

Kirkpatrick had asserted only claims on his own behalf under the Fourth and Fourteenth Amendments. Accordingly, the district court found that Kirkpatrick had not demonstrated that the defendants violated his constitutional rights because only B.W. suffered a potential Fourth Amendment violation, and Kirkpatrick had not established parental rights as of the date of the challenged seizure that could give rise to a Fourteenth Amendment claim. Finding that Kirkpatrick had failed to prove a constitutional violation, the court also entered judgment in favor of Washoe County. This appeal followed.

## DISCUSSION

Section 1983 provides a remedy for violations of rights secured by the Constitution by persons acting under the color of state law. 42 U.S.C. § 1983. However, the doctrine of qualified immunity shields individual officers "from liability for civil damages insofar as their conduct [did] not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Municipalities and other local governmental units are "persons" subject to suit under § 1983, but to prevail on a claim against a municipal entity for a constitutional violation, a plaintiff must also show that his or her injury is attributable "to official municipal policy of some nature." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978).

Kirkpatrick's claims against the social workers and Washoe County are addressed, in turn, below.

I.

We apply a two-prong analysis in qualified immunity cases, under which summary judgment is improper if, resolving all disputes of fact and credibility in favor of the party asserting the injury, (1) the facts adduced show that the officer's conduct violated a constitutional right, and (2) that right was "clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Thus, even if Kirkpatrick demonstrates that there is a question of fact as to whether the social workers violated his or B.W.'s constitutional rights, the workers are entitled to qualified immunity unless the law at the time of B.W.'s removal in 2008 clearly established the unconstitutionality of their conduct.

A.

Two provisions of the Constitution protect the parent-child relationship from unwanted interference by the state: the Fourth and the Fourteenth Amendments.[2] First, parents "have a well-elaborated constitutional right to live" with their children that "is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency." *Wallis v. Spencer*, 202 F.3d 1126,

---

[2] "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998). Therefore, because the Fourth Amendment provides a bulwark against unreasonable seizures, children who have been "seized" must pursue their claims under the purview of that specific constitutional provision.

1136 (9th Cir. 1999); *accord Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107 (9th Cir. 2001); *Ram v. Rubin*, 118 F.3d 1306, 1310 (9th Cir. 1997). Second, the Fourth Amendment safeguards children's "right . . . to be secure in their persons . . . against unreasonable . . . seizures" without a warrant, U.S. Const. amend. IV, although we similarly recognize an exception to the warrant requirement where the exigencies of the situation are so compelling that a warrantless seizure is objectively reasonable under the Fourth Amendment, *see Rogers v. County of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007). Therefore, we have said that the tests under the Fourth and Fourteenth Amendment for when an official may remove a child from parental custody without a warrant are equivalent. *Wallis*, 202 F.3d at 1137 n.8.

i.

We consider first Kirkpatrick's Fourteenth Amendment claim against the DSS workers. The parental right secured by the Fourteenth Amendment "is not reserved for parents with full legal and physical custody." *James v. Rowlands*, 606 F.3d 646, 651 (9th Cir. 2010); *see also Burke v. Cty. of Alameda*, 586 F.3d 725, 733 (9th Cir. 2009) (holding that non-custodial parents have a reduced liberty interest in the companionship, care, custody, and management of their children). At the same time, however, "[p]arental rights do not spring full-blown from the biological connection between parent and child." *Lehr v. Robertson*, 463 U.S. 248, 260 (1983) (quoting *Caban v. Mohammed*, 441 U.S. 380, 397 (1979) (Stewart, J., dissenting)) (emphasis omitted). Judicially enforceable interests arising under the Fourteenth Amendment "require relationships more enduring," which reflect some assumption "of parental responsibility." *Id.*

(internal quotation marks omitted).  It is "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child," that "his interest in personal contact with his child acquires substantial protection under the due process clause." *Id.* at 261 (internal quotation marks and alteration omitted).  Until then, a person with only potential parental rights enjoys a liberty interest in the companionship, care, and custody of his children that is "unambiguously lesser in magnitude." *James*, 606 F.3d at 651 (quoting *Brittain v. Hansen*, 451 F.3d 982, 992 (9th Cir. 2006)).

When the seizure of B.W. occurred, Kirkpatrick's due process rights concerning B.W. were negligible.  Whitworth informed Kirkpatrick that he might be the father just prior to giving birth to B.W., but told him that there was "a possibility it could be someone else's as well."  Kirkpatrick acknowledged that he "did not know" whether he was the father and that there were "possibly other candidates."  At the time, Kirkpatrick lived and worked several hours away in Elko, and although he was present for B.W.'s birth, he returned to Elko immediately thereafter.  He did not attend the initial protective custody hearing held two days after B.W. was born.  Kirkpatrick remained unsure whether he was B.W.'s biological father until the results of the court-ordered genetic test confirmed his paternity.  Before then, Kirkpatrick had minimal contact with Whitworth or B.W., and no responsibility—financial or otherwise—for either's care.  Consequently, Kirkpatrick was not a parent to B.W. in her first few days of life in the constitutional sense, and his substantive rights were not violated when the social workers placed her in protective custody without a warrant.

ii.

This brings us to B.W.'s Fourth Amendment claim. The district court construed the SAC as stating claims only on behalf of Kirkpatrick. We disagree. As noted above, the SAC alleged that "[B.W.'s] constitutional right to be with her parents was violated." Later, Kirkpatrick also alleged that "Defendants . . . acted under color of state law to deprive Plaintiff, as described herein, of constitutionally protected rights, including, but not limited to: . . . (d) the right to be free from unreasonable searches and seizures; . . . [and] (f) the right to be with her parents." Moreover, the defendants moved for summary judgment on the merits of B.W.'s Fourth Amendment claim and have thus not been prejudiced by any linguistic imprecision on Kirkpatrick's part in drafting the SAC. Accordingly, we conclude that Kirkpatrick sufficiently asserted a violation of *B.W.*'s Fourth Amendment rights to apprise the defendants that Kirkpatrick sought to adjudicate her claims in addition to his own. The district court erred in granting summary judgment to the defendants on the grounds that the SAC did not provide adequate notice of B.W.'s Fourth Amendment claim, and we address this theory of relief and the concomitant issue of qualified immunity for the first time on appeal. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998) ("We may affirm the district court's judgment on any ground finding support in the record, even if it relied on the wrong ground or reasoning.").

Under the Fourth Amendment, government officials are ordinarily required to obtain prior judicial authorization before removing a child from the custody of her parent. However, officials may seize a child without a warrant "if the information they possess at the time of the seizure is such as

provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Wallis*, 202 F.3d at 1138.

In *Rogers v. County of San Joaquin*, we clarified that seizing a child without a warrant is excusable only when officials "have reasonable cause to believe that the child is likely to experience serious bodily harm *in the time that would be required to obtain a warrant*." 487 F.3d at 1295 (citing *Mabe*, 237 F.3d at 1108) (emphasis added). *Rogers* concerned a social worker's removal of two children—ages three and five—from their home eighteen days after receiving an anonymous report that the children displayed signs of severe neglect. *See Rogers*, 487 F.3d at 1291. The report alleged that the children were not toilet-trained, that the parents locked the children in their rooms at night, that the children were not receiving medical or dental care, that the home was dirty and maggot-infested, and that the children had access to unsecured guns. *Id.* Child Protective Services ("CPS") classified the case as a non-emergency, one that only necessitated a response within ten days. *Id.* But after eventually observing the children in the home and talking to their parents, a CPS worker immediately removed the children without seeking a warrant. *Id.* at 1292–93.

We began in *Rogers* from the settled premise that social workers violate the Fourth Amendment by removing children absent a warrant or exigent circumstances. *Id.* at 1294. Under that standard, we found that none of the allegations of neglect in *Rogers* were sufficiently serious to justify the children's removal. *See id.* at 1294–95. Bottle rot, malnourishment, and disorderly home conditions do not present an imminent risk of serious bodily harm. *Id*. at 1295.

Furthermore, the "official's prior willingness to leave the children in their home militate[d] against a finding of exigency." *Id.* We observed that "[s]erious allegations of abuse that have been investigated and corroborated usually give rise to a 'reasonable inference of imminent danger sufficient to justify taking children into temporary custody' if they might again be beaten or molested during the time it would take to get a warrant," but concluded that the chance of grave harm befalling the Rogerses' children during the "few hours" the social worker believed it would have taken to request a warrant was very low—so low as to "not establish reasonable cause to believe that the children were in immediate danger." *Id.* at 1294–95.

*Rogers* thus makes clear that when social workers investigating suspected abuse or neglect can reasonably obtain a warrant without significantly risking serious bodily harm to the child in question, the Fourth Amendment mandates that they do so. This conclusion finds support in long-standing Fourth Amendment precedent. *See, e.g.*, *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (finding "no exigent circumstances" supporting a warrantless search because "[t]here was no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant"); *Michigan v. Tyler*, 436 U.S. 499, 509 (1978) ("[A] warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant."); *United States v. Echegoyen*, 799 F.2d 1271, 1279 n.5 (9th Cir. 1986) ("Exigent circumstances necessarily imply that there is insufficient time to get a warrant."); *United States v. Good*, 780 F.2d 773, 775 (9th Cir. 1986) ("Exigent circumstances alone, however, are insufficient as the government must also show that a warrant could not have been obtained in time.").

This rule is the logical corollary to the Constitution's proscription of warrantless seizures absent exigent circumstances; if the state had time to obtain a warrant, it stands to reason that there can be no "exigent circumstance."

Accordingly, under *Rogers*, the social workers here lacked cause to forgo a warrant if they had adequate time to pursue one through the ordinary judicial process without risking B.W.'s well-being. We hold that Kirkpatrick has raised a genuine dispute as to whether B.W. was in such imminent danger of serious bodily injury that no warrant was necessary. Whitworth's methamphetamine abuse did not pose a direct threat to B.W. while both mother and daughter remained in the hospital, where nurses were supervising all of B.W.'s medical needs. Nor did Whitworth's unemployment or lack of a stable place to live justify the social workers' actions. "[R]eliance on factors so closely related to economic status as a justification for removal would border on the unconstitutional." *Rogers*, 487 F.3d at 1296. In addition, although B.W.'s age may have rendered her more vulnerable to the harms of neglect if it were to occur, the undisputed evidence belies any contention that B.W. was in jeopardy of neglect in the maternity ward of the hospital, which Kennedy—a DSS supervisor—considered to be a safe environment. Wilcox, the social worker in charge of B.W.'s case, similarly confirmed that there was no danger to B.W. "[b]etween the time the hold was put on the child in the hospital and the time just before [she] left the hospital."

According to Kennedy's deposition testimony, the only potential "imminent risk" facing B.W. at the time that Wilcox removed her from Whitworth's custody was that B.W. "could die if she goes home with a mother who's high on drugs and forgets to feed her." But Whitworth was recovering from a

cesarean section and had demonstrated no resistance to the social workers' intervention: Whitworth even volunteered her case worker's contact information to hospital staff and remained in the hospital at the time of the protective custody hearing the day after B.W.'s removal.  At DSS's request, the hospital also put a hold on B.W.  Accordingly, the unlikely possibility that Whitworth might unexpectedly abscond with B.W. did not justify dispensing with the warrant requirement. *See Rogers*, 487 F.3d at 1295 ("So remote a risk does not establish reasonable cause to believe that the children were in immediate danger.").  A rational jury presented with this evidence could find that B.W. was under no immediate threat of serious physical injury, and, therefore, that the social workers violated her Fourth Amendment rights by removing her from her mother under non-exigent circumstances.

B.

We therefore turn to the second prong of the qualified immunity analysis, which requires Kirkpatrick and B.W. to demonstrate that this right was "clearly established." *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1065 (9th Cir. 2006).

"To determine whether a right is clearly established, the reviewing court must consider whether a reasonable [official] would recognize that his or her conduct violate[d] that right under the circumstances faced, and in light of the law that existed at that time." *Id*.  While "[s]pecific binding precedent is not required to show that a right is clearly established," *Calabretta v. Floyd*, 189 F.3d 808, 813 (9th Cir. 1999) (citation omitted), "existing precedent must have placed the statutory or constitutional question beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  "Our task is to

determine whether the preexisting law provided the defendants with 'fair warning' that their conduct was unlawful." *Kennedy*, 439 F.3d at 1065 (quoting *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1137 (9th Cir. 2003)). "This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks omitted).

In July 2008 it was well-settled that a child could not be removed without prior judicial authorization absent evidence that the child was in imminent danger of serious bodily injury. *See Rogers*, 487 F.3d at 1297 (recognizing that the law has been clearly established in the Ninth Circuit since *Mabe*, if not earlier); *see also Mabe*, 237 F.3d at 1106; *Wallis*, 202 F.3d at 1138; *Ram*, 118 F.3d at 1310. But the Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742 (citation omitted). "Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures." *Sheehan*, 135 S. Ct. at 1776.

In 2008, it was not beyond debate that the confluence of factors set forth above would not support a finding of exigency. No Supreme Court precedent defines when a warrant is required to seize a child under exigent circumstances. And although the Supreme Court has assumed that circuit precedent can be a dispositive source of clearly established law, *see id.*; *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014); *Reichle v. Howards*, 132 S. Ct. 2088, 2094

(2012), none of the cases from this court explain when removing an infant from a parent's custody at a hospital to prevent neglect, without a warrant, crosses the line of reasonableness and violates the Fourth Amendment. *See Rogers*, 487 F.3d at 1291–93 (finding that malnourishment and bottle rot were not "imminent dangers" to two toddlers); *Mabe*, 237 F.3d at 1108 (denying summary judgment where social worker seized a 14-year-old girl who accused her stepfather of sexual abuse without a warrant); *Wallis*, 202 F.3d at 1138 (holding that there was a genuine factual dispute over the "imminency" of the danger to a child based on allegations that the child's father intended to ritually sacrifice him to Satan the following week). In fact, very few cases from any circuit have addressed what constitutes exigent circumstances in a case that remotely resembles this one. *Cf. Kia P. v. McIntyre*, 235 F.3d 749, 761–63 (2d Cir. 2000) (holding that a hospital's retention of a newborn who tested positive for methadone at birth was reasonable under the Fourth Amendment). No matter how carefully a reasonable social worker had read our case law, she could not have known that seizing B.W. would violate federal constitutional law. Without that fair notice, the social workers in this case are entitled to qualified immunity.

## II.

Our inquiry, however, is not over. Summary judgment on B.W.'s Fourth Amendment claim against Washoe County is still inappropriate if we can trace the social workers' unconstitutional removal to a systemic failure to train DSS officers to obtain a warrant before seizing a child to investigate abuse or neglect.

To prevail on a claim against a municipal entity for a constitutional violation, a plaintiff must show that an official's action that caused the plaintiff's injury was pursuant "to official municipal policy of some nature." *Monell*, 436 U.S. at 691. To do so, a plaintiff must go beyond the respondeat superior theory of liability and demonstrate that the alleged constitutional deprivation was the product of a policy or custom of the local governmental unit. *Connick v. Thompson*, 563 U.S. 51, 60 (2011). Under this standard, a municipal defendant can be held liable because of a failure to properly train its employees only if the failure reflects a "conscious" choice by the government. *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997); *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). In other words, the government's omission must amount to a "policy" of deliberate indifference to constitutional rights. *Harris*, 489 U.S. at 389. A plaintiff can satisfy this requirement by showing that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id*. at 390.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Brown*, 520 U.S. at 410). Satisfying this standard requires proof that the municipality had "actual or constructive notice that a particular omission in their training program" will "cause[] [municipal] employees to violate citizens' constitutional rights." *Id.* (quoting *Brown*, 520 U.S. at 410). In turn, to demonstrate that the municipality was on notice of a constitutionally significant gap in its training, it is "ordinarily necessary" for a plaintiff

to demonstrate a "pattern of similar constitutional violations by untrained employees." *Id.* at 62.

Contrary to the dissent's suggestion, evidence of a pattern of constitutional violations is not always required to succeed on a *Monell* claim. *See* Dissent Op. at 36–37, 38. The Supreme Court has reaffirmed that "in a narrow range of circumstances" a particular "showing of 'obviousness' can substitute for the pattern of violations ordinarily necessary to establish municipal culpability." *Connick*, 563 U.S. at 63. Such a situation is "rare"—"the unconstitutional consequences of failing to train" must be "patently obvious" and the violation of a protected right must be a "highly predictable consequence" of the decision not to train. *Id.* For example, the Supreme Court has opined that a single incident of excessive force, coupled with evidence that a city had neglected to train its armed officers on the constitutional limitations on using force against fleeing felons, might establish that the city manifested deliberate indifference in training law enforcement. *See Harris*, 489 U.S. at 390 n.10.

A.

In support of his claim that Washoe County maintained an unconstitutional practice of seizing children without a warrant in non-exigent circumstances, Kirkpatrick adduced testimony from Wilcox and Kennedy that they were wholly unfamiliar with the process for obtaining a warrant before taking custody of a child. Wilcox started working at DSS in June of 2007, a year before she handled B.W.'s case. Yet, Wilcox testified that she never received training on how to obtain a warrant during the two years that she was employed by Washoe County, or that she was instructed that social workers must obtain a warrant in non-emergency situations. And, although

Wilcox stated that she was trained on "imminent" danger, she could not provide detail on what she had been taught. Under questioning, Wilcox admitted that a hypothetical child in B.W.'s circumstances was not in imminent danger:

> **Q**: But [a child is] not going to be returned to his father for four days. Is that imminent danger?
>
> **A**: No.

Wilcox also testified that she would likely remove such a child anyway, and without a warrant:

> **Q**: So what do you do for that child when the mother insists on returning him to a dangerous situation and the father insists on getting him in that dangerous situation, no questions asked, you have already determined and everybody agrees it's a danger?
>
> **A**: Then we remove the child.
>
> **Q**: You don't get a warrant?
>
> **A**: No.
>
> **Q**: The child you admitted is not in imminent danger.
>
> **A**: No. We don't get a warrant.

**Q**: But would you remove the child even though the danger may be three or four days away?

**A**: Yes.

Wilcox attributed her answer to Washoe County's unofficial custom or protocol:

**Q**: Let me ask you an obvious question. If the child wasn't in danger in the hospital and was there for several days, why didn't you seek a warrant before you removed the child from mom? Is it because you didn't know you had to? You weren't trained on that?

**A**: It wasn't the protocol of Washoe County. No one told me to get a warrant and they didn't train me how to go about getting a warrant.

**Q**: Or did they even tell you you could get a warrant?

**A**: No. They didn't.

Kennedy—who supervised between five and seven social workers, including Wilcox—confirmed that it was "not in [DSS's] general practice" to obtain a warrant before removing a child:

**Q**: Back in July of '08, did you understand that there was a distinction between removing

a child with a court warrant and without a court warrant?

**A**. No. I don't believe at that point we ever had court warrants . . . .

**Q**. So your best recollection is that as of July of '08, Washoe County Child Protective Services did not obtain court warrants prior to the removal of a child in any circumstances?

**A**: I wouldn't say in no circumstances. But not in our general practice. No. There could be—we had asked for warrants sometimes when there was like a suspected kidnapping or something like that where we had some prior knowledge, let's say. But generally speaking, we did not. I don't recall ever getting a warrant to go out with one of my investigators to go out and pick up a child unless it was a special circumstance.

She elaborated that in cases like B.W.'s, she might have obtained a warrant "in a rare instance," but she did not recall ever doing so:

**Q**: You mentioned that you have a recollection of obtaining—of seeking warrants in situations like kidnappings and things like that. . . . What I'm more interested in is the case where you've gotten a complaint or a report of some sort of child neglect that triggers an investigation which leads to determining that a child needs to be removed. Okay? That's the case I'm more interested in. Under those

kind of circumstances, do you have any knowledge of ever obtaining a warrant to remove a child under those type of general circumstances?

**A**: I do not recollect doing that. No.

**Q**: So it would be safe to say that in your career with Washoe County Child Protective Services you're not aware of ever obtaining a warrant to remove a child from a parent?

**A**: I don't recollect ever doing that. However, that is not to say that it could have occurred in a rare instance that I'm not just recalling. It was not a general practice ever to get a warrant.

While discussing the process of removing a child from her parent without a warrant, Kennedy noted that "Washoe County has all kinds of policies and procedures for everything," and that the "policy[] was never to get warrants" when removing children:

**Q**: You stated when a baby or a child is kidnapped that would be a situation where you would get a warrant.

**A**: Generally speaking, yes. That happens very rarely.

**Q**: A warrant to remove the child from the kidnapper or a warrant to arrest the kidnapper?

**A**: A warrant to remove the child. We have nothing to do arresting people.

**Q**: So if it's a kidnapper you get a warrant to remove it but if it's a parent you don't?

**A**: That's our policy, was never to get warrants when we remove children when I worked as a supervisor.

**Q**: There was a policy to not get warrants or there was no policy?

**A**: There was no policy related to warrants.

### B.

The County does not dispute that, at the time of B.W.'s seizure, it had no policy or procedures for obtaining warrants before removing children from parental custody, or for training its social workers to recognize that a warrant may be required. The lack of a formal policy is not necessarily unconstitutional if DSS removes children only in cases in which the removal is justified by exigent circumstances. *Cf. Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (finding evidence that a city had indemnified an officer in an excessive force case was not facially unconstitutional and thus insufficient for municipal liability). Nor does a single unconstitutional incident, without more, establish that a municipality failed to provide proper training. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821–24 (1985); *cf. Miranda v. City of Cornelius*, 429 F.3d 858, 869 (9th Cir. 2005) (holding that the city incurred no liability under § 1983 based solely on a constitutional violation sustained by the

plaintiff where the violation occurred in contravention of the city's official policy).  However, the evidence that the social workers violated B.W.'s Fourth Amendment rights, in conjunction with Wilcox and Kennedy's testimony that the County had no policy of obtaining warrants before removing children from parental custody and that it was social workers' regular practice to remove children regardless of the risk of imminent bodily harm, raises more than a spectre of deliberate indifference by Washoe County.[3]  This is therefore a case in which the municipality's "inadequacy [is] so likely to result in the violation of constitutional rights" that a jury could reasonably find § 1983 liability without needing a pattern of violations to find the County culpable.  *See Harris*, 489 U.S. at 390 (holding that the city could be held liable for failing to train police officers in determining whether detainees needed medical care because of the likelihood that, absent proper training, the officers would default on their constitutional obligations).  Given the work performed by DSS social workers, the need for DSS to train its employees on the constitutional limitations of separating parents and children is "so obvious" that its failure to do so is "properly . . . characterized as 'deliberate indifference' to [the]

---

[3] The dissent notes that both Kennedy and Wilcox testified that they were trained to remove a child only in the presence of imminent danger, which indicates that the County trains its social workers pursuant to a lawful policy for removing children from parental custody. *See* Dissent Op. at 37.  But Wilcox also testified that she could not recall her "imminent" danger training and admitted that, despite any such training, she would likely effectuate a warrantless removal of a child who was not in imminent danger.  Further, Wilcox testified that she was never trained on how to obtain a warrant and Kennedy confirmed that it was generally not the County's protocol to obtain a warrant prior to removing a child. This testimony is sufficient to raise a genuine issue of material fact as to whether the County maintained a policy of unconstitutionally seizing children in non-exigent circumstances.

constitutional rights" of Washoe County families. *See id.* at 390 & n.10. Accordingly, a question of material fact exists regarding whether Washoe County maintained an unconstitutional, unofficial policy. Summary judgment on this claim is inappropriate.

There is also a question of fact for the jury as to whether these customs and practices had a "direct causal link" to the deprivation of B.W.'s Fourth Amendment rights. *See id.* at 389 ("[A] municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" (quoting *Monell*, 436 U.S. at 694)). A reasonable jury could conclude that DSS's policy of conducting warrantless seizures of children in non-exigent circumstances was the moving force behind the warrantless removal of B.W. from Whitworth's custody. *See Wallis*, 202 F.3d at 1143 (concluding that material issues of fact precluded summary judgment regarding the existence of a municipal custom or practice of taking children from their homes without adequate safeguards based on testimony from three detectives who had seized a child from his home). Consequently, the County is not entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment to the defendants on Kirkpatrick's claim that they violated his Fourteenth Amendment rights by seizing B.W. without due process because he had no enforceable parental rights at the time of her removal. We also affirm the district court's grant of summary judgment to the social workers on B.W.'s Fourth Amendment claim; although the social workers should have obtained a warrant, their constitutional obligation to do so

was not clearly established, and they are therefore entitled to qualified immunity on this claim. However, we reverse summary judgment and remand on B.W.'s claim against Washoe County because Kirkpatrick has presented sufficient evidence to raise a genuine issue of material fact regarding whether the County maintained a policy of unconstitutionally seizing children in non-exigent circumstances.

**AFFIRMED in part; REVERSED in part and REMANDED.** Each party shall bear their own costs on appeal.

CHRISTEN, Circuit Judge, with whom Circuit Judge HURWITZ joins, concurring:

I agree with the results reached by the majority: Kirkpatrick's claim was correctly dismissed; a reasonable jury could have found the warrantless seizure of B.W. violated her constitutional rights but the individual social workers were entitled to qualified immunity; and the County was not entitled to summary judgment on the claim that its policies violated B.W.'s Fourth Amendment rights. I write separately to address, briefly, what the court describes as "the unlikely possibility that Whitworth might unexpectedly abscond with B.W." Maj. Op. at 16.

In *Rogers v. County of San Joaquin*, we unequivocally explained that social workers are required to obtain a warrant before seizing a child unless there is "reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." 487 F.3d 1288, 1294 (9th Cir. 2007). Here, the social

workers' testimony makes plain that they gave no thought to obtaining a warrant, apparently because the County made no effort to train its social workers on this requirement. The dissent argues that B.W.'s constitutional rights were not violated because the County correctly trained its workers to remove children only in exigent circumstances. *See* Dissent Op. at 37. But the record tells us nothing about how long it might have taken to obtain a warrant and almost nothing about how likely it was that Whitworth would leave the hospital before a warrant could be obtained. For example, we cannot tell whether the social workers' conversations with Whitworth caused concern that she might leave. There were unresolved questions of fact at the summary judgment stage, but it was known that the informal "hold" DSS requested did not actually prevent Whitworth from leaving the hospital with B.W., or giving another adult permission to remove the baby.

If the disputed facts are construed in the light most favorable to B.W., it must be assumed that it would have been possible for the social workers to obtain a warrant without delay. On the other hand, it only takes minutes to walk out of a hospital. Even if the risk that Whitworth would leave with B.W. was small, I cannot set aside the possibility that Whitworth might have done so simply because she was recovering from a cesarean section. *See* Maj. Op. at 15–16. Social workers are entitled to rely on their experience, and at least one social worker testified that she had seen patients recovering from cesarean sections leave the hospital unexpectedly. Compounding the problem, Whitworth had a poor track record of staying in touch with the social workers and they knew they had no way to reach her if she left the hospital.

Boiled down, it seems to me that the individual social workers correctly determined that this newborn faced a catastrophic risk *if* her mother removed her from the hospital, (she "could die if she goes home with a mother who's high on drugs and forgets to feed her"), and it would only have taken a few minutes for someone to leave with B.W. The social workers' error, if any, was in pegging the *likelihood* that B.W.'s mother would leave with her. The social workers may have jumped the gun, but how much risk were they required to tolerate with the life of a newborn baby at stake? I conclude the social workers reasonably refused to gamble that Whitworth would make the sound decision to leave B.W. in the hospital. Thus, the applicable standards entitle them to qualified immunity.

FRIEDLAND, Circuit Judge, with whom THOMAS, Chief Judge, joins, concurring in part and dissenting in part:

I join the majority's opinion as to municipal liability but dissent from its affirmance of summary judgment on the claim against the individual defendants. An official is liable, and not entitled to qualified immunity, if her "conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The constitutional rule that B.W. could not be seized without a warrant absent imminent danger was clearly established, and it was equally clear that there was no imminent danger to B.W. On the Fourth Amendment claim against the social workers, I would therefore hold that summary judgment to Defendants should

be reversed and Plaintiff's cross-motion for summary judgment should be granted.[1]

The majority correctly recognizes that the rule of law at issue here was clearly established at the time: "[A] child could not be removed without prior judicial authorization absent evidence that the child was in imminent danger of serious bodily injury." Maj. Op. at 17 (citing *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288, 1297 (9th Cir. 2007)); *see also Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001) ("Government officials are required to obtain prior judicial authorization before intruding on a parent's custody of her child unless they possess information at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.'" (quoting *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000))). Nevertheless, the majority holds that the social workers are entitled to qualified immunity because it was debatable whether B.W. was in imminent danger. I disagree.

The only conclusion to be drawn from the very record evidence the majority discusses is that no reasonable social worker could have believed B.W. was in imminent danger of serious bodily injury. *See Saucier v. Katz*, 533 U.S. 194, 207 (2001) ("Fourth Amendment issues [ ] are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred."). As the majority correctly points out, Whitworth's methamphetamine abuse

---

[1] Plaintiff filed a cross-motion for summary judgment and has argued on appeal that it should have been granted.

could not have reasonably posed a threat to B.W. while both were in the hospital because, even though hospital staff noted that Whitworth was apparently not taking adequate care of B.W., nurses were attending to the newborn's needs. Maj. Op. at 15.**[2]** Nor was there any reasonable risk that Whitworth would abscond with B.W. In the majority's own words, "Whitworth was recovering from a cesarean section, and had demonstrated no prior resistance to the social workers' intervention[.] . . . [S]he remained in the hospital at the time of the protective custody hearing the day after B.W.'s removal [, and] the hospital [had] also put a hold on B.W." Maj. Op. at 15–16. "Accordingly," the majority correctly concludes, there was only an "unlikely possibility that Whitworth might unexpectedly abscond with B.W." *Id.* at 20. "So remote a risk does not establish reasonable cause to believe that the child[] [was] in immediate danger." *Rogers*, 487 F.3d at 1295.

Indeed, as the majority correctly recognizes, the social workers expressly admitted that they did not believe B.W. was in imminent danger at the time they seized her. *See* Maj. Op. at 15 (describing Defendant Kennedy's testimony that the hospital's maternity ward is a safe environment and Defendant Wilcox's testimony that there was no danger to B.W. while the hospital's hold was in place). I am aware of no contrary testimony that would create a triable issue as to whether B.W. was in imminent danger. On this record, it is

---

**[2]** Whitworth's unemployment and lack of stable housing could not justify the warrantless seizure because, again as the majority aptly states, "[r]eliance on factors so closely related to economic status as a justification for removal would border on the unconstitutional." Maj. Op. at 15 (quoting *Rogers*, 487 F.3d at 1296). Nor did Whitworth's unemployment and a lack of stable housing pose an imminent danger to B.W. while both were in the hospital.

thus clear that B.W. was not in imminent danger. The social workers therefore violated B.W.'s clearly established rights in failing to obtain a warrant before seizing her.

Although it is true that no binding authority has addressed this exact factual scenario, such specificity is not required for a constitutional obligation to be "clearly established." *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (stating that for a constitutional right to be clearly established, the "very action in question" need not have "previously been held unlawful," as long as "in the light of pre-existing law the unlawfulness [is] apparent" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))). It was clearly established that a child could not be seized without a warrant absent imminent danger, and the inescapable conclusion to be drawn from this record is that no objective social worker could have believed—and indeed, these social workers did *not* believe—that B.W. was in imminent danger. It follows, therefore, that the social workers violated B.W.'s clearly established constitutional rights.

In my view, qualified immunity should be denied and summary judgment entered for Plaintiff on the Fourth Amendment claim. I dissent from the majority's contrary conclusion.

KOZINSKI, Circuit Judge, with whom Circuit Judges O'SCANNLAIN, RAWLINSON and BEA join, and Circuit Judge WATFORD joins with respect to Part 2, dissenting in part:

For the reasons explained in my panel dissent, I agree that the social workers here are entitled to qualified immunity and join that part of the opinion. But I cannot agree that the social workers committed a constitutional violation, nor that the County can be liable for a policy of unconstitutional conduct under *Monell*. I therefore dissent from those portions of the opinion.

### 1.  There Was No Constitutional Violation

The majority acknowledges that Whitworth was a drug addict who used meth throughout her pregnancy—transferring it to her baby—and had no job or stable living situation. Op. at 5, 15. And my colleagues recognize that "B.W.'s age may have rendered her more vulnerable to the harms of neglect if it were to occur." *Id.* at 15. They even quote Kennedy testifying that B.W. "could die if she goes home with a mother who's high on drugs and forgets to feed her." *Id.* at 15.

The majority dismisses this exigency because Whitworth remained in the hospital recovering from her c-section "and had demonstrated no resistance to the social workers' intervention: Whitworth even volunteered her case worker's contact information to hospital staff." *Id.* at 15–16. I disagree with both prongs of the majority's reasoning.

That Whitworth was recovering from surgery certainly doesn't mean she couldn't leave the hospital on short notice.

The social workers here testified that moms like Whitworth "don't always stay for a few days at the hospital, sometimes they just leave" even after a c-section, as Judge Christen notes. *See* Christen, J., concurring, at 29. It may have been foolish for Whitworth to do so, but someone who abuses her body and baby by using meth throughout her pregnancy can hardly be counted on to calculate danger rationally or avoid putting herself and her baby at risk.

We may evaluate the risks differently with the benefit of hindsight, but that is not the test. The test is whether well-informed social workers on the scene could reasonably believe that leaving the baby in the mother's control while they sought a warrant would put the baby at *some* risk of serious bodily injury or death. *See Ryburn* v. *Huff*, 132 S. Ct. 987, 992 (2012) (per curiam); *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 735–36, 743–44 (2011). I don't read the majority as saying that there was *no* risk of harm to the baby, only that the risk was small. As Judge Christen aptly notes, "the social workers reasonably refused to gamble that Whitworth would make the sound decision to leave B.W. in the hospital." Christen, J., concurring, at 30. We are not entitled to second-guess that judgment.

That the mother was cooperative was no guarantee that she wouldn't change her mind. Meth addicts can be volatile. Because "it only takes minutes to walk out of a hospital," *id.* at 29, and put a baby's life in danger, any time the social workers took to get a warrant would be too much. My colleagues in the majority are willing to risk a baby's life on the presumed rational behavior of a woman who treats her own health and that of her baby with contempt. I can't agree that the social workers were unreasonable in taking a different view. Indeed, they reasonably could have taken the

mother's cooperation as consent, which also would have obviated the need for a warrant.

The test under the Fourth Amendment is reasonableness. The Supreme Court has "instructed that reasonableness must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ryburn*, 132 S. Ct. at 992 (internal quotation marks and citation omitted). "Judged from the proper perspective of a reasonable officer forced to make a split-second decision in response to a rapidly unfolding chain of events," *id.*, the social workers here acted reasonably in the difficult circumstances presented to them. Had they left to get a warrant, and had the mother departed the hospital with the baby, they would have had the baby's life on their conscience. I cannot blame them for refusing to take that small—but far from trivial—risk.

## 2.  The County Is Not Liable Under *Monell*

The majority compounds its error by holding that the County can be liable for B.W.'s supposedly unconstitutional removal: "Summary judgment on B.W.'s Fourth Amendment claim against Washoe County is still inappropriate if we can trace the social workers' unconstitutional removal to a systemic failure to train DSS officers to obtain a warrant before seizing a child to investigate abuse or neglect." Op. at 18.  But the majority never points to any evidence of a *systemic* problem.  The only evidence we have is the experience of the two social workers who were named as defendants in this case.  There is no evidence that the training these social workers received was typical.  The plaintiffs presented no evidence at all as to the training and guidance given to the rest of the County's social workers, or even how

many of them there were. The experience of these two individuals could be atypical; two data points aren't enough to establish a pattern or policy.

The majority frames this case as one where the unconstitutional consequences of failing to train were so "obvious" that the violation of a right was "highly predictable." *Id.* at 20 (quoting *Connick* v. *Thompson*, 563 U.S. 51, 64 (2011)); *see also id.* at 26–27. But the social workers testified that the County trained them on the law and instructed them to remove a child only if there were an *imminent* risk of harm. So there was training and there was a standard: "imminent risk to the well being of that child" or "imminent danger." According to the evidence, this meant "a child's life was in danger"; that a "child would suffer a serious injury or even possibly death if something wasn't done." That's the constitutional standard: If there are exigent circumstances, no warrant is required. It's not "highly predictable" that the County's training would lead to unconstitutional results.

The majority recognizes that "[t]he lack of a formal policy is not necessarily unconstitutional if DSS removes children only in cases in which the removal is justified by exigent circumstances." *Id.* at 25. The majority gets around that conclusion by finding "it was social workers' regular practice to remove children regardless of the risk of imminent bodily harm." *Id.* at 26. As is often the case with appellate fact-finding, this is a figment.

The majority points to no evidence of a "regular practice" or even a single other instance of children being removed when there was no imminent risk of harm. Instead, they rely on Wilcox's testimony that "she was trained on 'imminent'

danger," but couldn't remember the specifics of that training at a deposition three years later. *Id.* at 20–21, 26 n.3. So what? The County is hardly at fault because employees are unable to give details of their training sessions years later. The majority also uses a deposition hypothetical—whether Wilcox would get a warrant to remove a child who will return in four days to a molesting father—as proof that the County's training was insufficient because it didn't teach the social workers to get a warrant. *Id.* at 21–22, 26 n.3. The hypothetical is totally inapposite here, where even a few minutes would be enough for Whitworth to leave the hospital with B.W. and put her life at risk. *See supra* p. 35. The County cannot be held liable under *Monell* based on what an employee says she would have done in a non-analogous, hypothetical situation.

But even if the majority's illusory finding were supported by the record, it wouldn't be enough. "A *pattern* of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (emphasis added) (citation omitted). Here, there is no evidence that the County unconstitutionally removed *any* other child because it failed to train social workers on how to get warrants. The majority derives a pattern from a single data point.

\*        \*        \*

The majority gets it almost right. I dissent because, when life or death are concerned, "almost right" isn't.