Concurrence by Judge Berzon;
Partial Concurrence and Partial Dissent by Judge Zouhary;
Dissent by Judge N.R. Smith
OPINION
PER CURIAM:[1]

As this court has stated repeatedly, families have a “well-elaborated constitutional right to live together without governmental interference.” Wallis v. Spencer, 202 F.3d 1126, 1136 (9th Cir. 2000); accord Kirkpatrick v. Cty. of Washoe, 843 F.3d 784, 789 (9th Cir. 2016) (en banc); Burke v. Cty. of Alameda, 586 F.3d 725, 731 (9th Cir. 2009); Rogers v. Cty. of San Joaquin, 487 F.3d 1288, 1294 (9th Cir. 2007); Mabe v. San Bernardino Cty., 237 F.3d 1101, 1107 (9th Cir. 2001); Ram v. Rubin, 118 F.3d 1306, 1310 (9th Cir. 1997). We consider here Lisa and Anthony (“A.J.”) Demaree’s contention that social workers Laura Pederson and Amy Van Ness violated their constitutional rights to family unity and companionship, and their small children’s as well, by removing the children from home without a warrant or court order.

*1070 I. Background
A.J. Demaree dropped off some family-photos to be printed at á Wal-Mart in Arizona on Friday, August 29, 2008. While developing the pictures, an employee noticed that several pictures portrayed nude children. Wal-Mart called the police. Detective John Krause came and collected the pictures. On Saturday, he photocopied the ones that concerned the Wal-Mart employee and went to the Deraarees’ home.
Once there, he and his partner separately interviewed parents Lisa and A.J. De-maree. Both parents looked at the pictures, identified their daughters—five-year-old T.D., four-year-old J.D., and one- and-a-half-year-old L.D.—and said the pictures had been taken “in the last couple of months” by one or both parents. When asked what he would do with one photo, which portrayed his three children lying down on a towel nude, focusing on then-exposed buttocks but with some genitalia showing, he responded, “I’m not going' to do anything with that one. That’s not going in a photo album; that’s just one we have.” Krause said, “Obviously you’re not going to share it with somebody, I would hope,” to which A.J. responded, “No, absolutely not!” Krause then asked why he would take the photo in the first place, and A.J. responded, “So when we look back on em years later, look at their cute little butts.”
None of the photographs portrayed children engaged in sexual activity. None portrayed the children’s genitalia frontally.
After the interviews, the detectives took T.D., J.D., arid L.D. to forensic' and medical exams to investigate possible sexual abuse. The physical exams came back normal for all- three children. After the interviews were finished, Krause’s partner dropped the children back off with their parents. Krause wrote in his report, “[a]p-parently after the forensic interviews and medical exams were completed,, [Child Protective Services] declined to remove the children from the parent’s custody, and had directed [his partner] to return the girls to Lisa and A. J.”[2]

While the exams were in progress, the police department requested arid received a warrant to search the Demarees’ home. Executing the warrant, the department seized all the evidence that might be relevant to a child pornography investigation: computers, printers, photographs, cell phones, undeveloped film, floppy discs, DVDs, CDs, VHS tapes, and cameras.
As the home search was nearing its end, and after the children had been returned to their parents, Child Protective Services (“CPS”) investigating officer Laura Peder-son called one of the. police officers to discuss the case. After the conversation, she decided to drive over to the house. There,. Pederson discussed with .Krause the evidence seized, the content of the pictures, and Krause’s expectation that felony child sexual exploitation charges would be brought against both parents.
After reviewing the evidence Krause showed her, Pederson- decided to take the children into emergency temporary custody, without obtaining a court order or a warrant. She later said, “I was relying on the fact that ... at the time there was a pending criminal investigation with both parents named, as suspects. I was relying on information that Krause obtained during the investigation ,.. his opinion of the criminal acts that were committed, my viewing of the pictures and the fact that the—all of this suggested these children were at risk of further exploitation.” She *1071 discussed her recommendation with her supervisor, Amy Van Ness, who agreed.
Pederson gave the parents a “Temporary Custody Notice.” In that notice, in the space provided for investigators to “[c]heck the circumstances (imminent risk factor) that most clearly describes the reason temporary custody was necessary,” Pederson checked “[o]ther,” and wrote, “mother & father have taken sexually explicit pictures of all three children.” She did not check the box for situations where “[t]he child’s caregiver has engaged in sexual conduct with a child, or has allowed the child to participate in sexual activity with others.” On the next page, in the space provided for investigators to inform parents of the “complaint or allegation concerning [their] family [that] is currently under investigation,” she wrote, “Sexual Abuse—child pornography/exploitation.”
Pederson then drove T.D. and J.D. to one foster home and L.D. to another. Two days later, Pederson brought the children to their grandparents’ home, where all three stayed for about a month, after which they were returned to their parents. The juvenile court never adjudicated the children abused or neglected, and neither A.J. nor Lisa were arrested or charged with any crime.
A.J. and Lisa later filed the instant, action on behalf of themselves and their children, alleging violations of various constitutional rights. The district court dismissed the claims against all defendants except Krause, Pederson, and Van Ness. The Demarees later settled their claims against Krause.
As relevant here, the district court granted summary judgment in favor of Pederson and Van Ness based oh qualified immunity. It ordered the parties to propose appropriate redactions to the summary judgment order, which was temporarily filed under seal on April 23, 2014. On May 21, the Demarees requested leave to file under seal a motion to alter or amend the judgment under Federal Civil Rule 59. Six days later, the district court denied the motion for leave to file under seal, and also denied the Demarees’ request to seal the summary judgment order in its entirety. The Demarees filed this appeal on June 23.
II. Discussion
A, Timeliness of the Appeal
Before we address the merits, we consider whether this appeal is timely. Three court rules are pertinent to our inquiry here: First, Federal Rule of Appellate Procedure 4(a)(4)(A) tolls the deadline to file a notice of appeal upon the timely filing of certain motions, including a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59, such that the time to appeal—here, 30 days— runs “from the entry of the order disposing of the last such remaining motion.” Second, Federal Rule of Civil Procedure 5(d)(2) provides that “[a] paper is filed by delivering it ... to the clerk.” And third, Arizona Local Rule 5.6(c) requires a document meant to be filed under seal first to “be lodged with the Court in electronic form” using the electronic filing system.
The Demarees accordingly “lodged” a copy of their Rule 59 motion and requested leave to file it under seal. The district court denied the request. But its order, although in form a denial of the request to file the motion under seal, did not refer to or discuss any of the factors relevant to filing documents under seal. Cf. Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1135 (9th Cir. 2003). Instead, the order addressed only the merits of the Rule 59 motion, denying the request to file under seal because the underlying motion was “unnecessary” and “a repeat of arguments previously made, at great length, in Plaintiffs’ filings.” The Demarees filed *1072 their Notice of Appeal twenty-seven days after the issuance of the order denying leave to file their Rule 59 motion under seal, and fifty-five days after the summary judgment order. Pederson and Van Ness contend that the Demarees’ appeal was not timely because the Rule 59 motion was never actually filed and therefore could not toll the deadline for appeal under Rule 4(a)(4).

(i) Jurisdiction versus mandatory claim-processing

The parties describe the timeliness issue as jurisdictional. Under a recent Supreme Court case, it is not.
“[A]n appeal filing deadline prescribed by statute will be regarded as ‘jurisdictional’ .... But a time limit prescribed only in a court-made rule ... is not jurisdictional; it is, instead, a mandatory claim-processing rule. ...” Hamer v. Neighborhood Hous. Servs. of Chi., — U.S. —, 138 S.Ct. 13, 16-17, 199 L.Ed.2d 249 (2017). In other words, “[i]f a time prescription governing the transfer of adjudicatory authority from one Article III court to another appears in a statute, the limitation is jurisdictional; otherwise, the time specification fits within the claim-processing category.” Id. at 20 (internal citations and footnote omitted).
Before Hamer, we held the timeliness rule at issue here jurisdictional. See United States v. Comprehensive Drug Testing, Inc., 513 F.3d 1085, 1100 (9th Cir. 2008), aff'd and adopted en banc, United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162, 1167 (9th Cir. 2010) (en banc). Comprehensive Drug Testing recognized that “Fed. R. App. P. 4(a)(4) does not contain language from 28 U.S.C. § 2107,” or any other relevant statute.[3] But Comprehensive Drug Testing regarded Bowles v. Russell, 551 U.S. 205, 214, 127 S.Ct. 2360, 168 L.Ed.2d 96 (2007) as indicating that all timeliness problems in notices of appeal were jurisdictional, whether directly traceable to a statutory requirement or not. Comprehensive Drug Testing, 513 F.3d at 1100.

Hamer, 138 S.Ct. at 21, squarely rejected Comprehensive Drug Testing’s reading of Bowles in the context of another provision of Fed. R. App. P. 4, Rule 4(a)(5)(C). That Rule also established a “time prescription ... absent from the U.S. Code.” Id. Hamer noted that “[sjeveral Courts of Appeal ... ha[d] tripped over [its] statement in Bowles that ‘the taking of an appeal within the prescribed time is “mandatory and jurisdictional,” ’ ” even though that statement was “a characterization left over from days when [the Supreme Court] w[as] ‘less than meticulous’ in [its] use of the term ‘jurisdictional.’ ” Id. (internal citations and footnotes omitted).

Comprehensive Drug Testing recognized the absence of a statutory basis for Rule 4(a)(4) but—understandably, as Hamer recognizes—tripped over the very language in Bowles that Hamer disavows. Comprehensive Drug Testing's holding that all timeliness issues in notices of appeal are jurisdictional, even where, as here, the Rule’s provision is not statutorily mandated, is thus flatly irreconcilable with Hamer. See Miller v. Gammie, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Under Hamer, Rule 4(a)(4) is not jurisdictional; instead, Rule 4(a)(4) is a mandatory claim-processing rule.
The defendants challenged the timeliness of this appeal in their brief before us, so we must address that question, even though not jurisdictional. See, e.g., Amalgamated Transit Union Local 1309 v. 
*1073
Laidlaw Transit Servs., Inc., 435 F.3d 1140, 1145 (9th Cir. 2006); Kwai Fun Wong v. Beebe, 732 F.3d 1030, 1035-36, 1047 (9th Cir. 2013) (en banc).

(ii) This appeal was timely

Turning to the particular application of Rule 4(a)(4) before us: We recently addressed a similar issue in Escobedo v. Applebees, a sex discrimination case. There, Escobedo delivered her complaint to the clerk’s office sixty-nine days after receiving her right-to-sue letter from the EEOC. 787 F.3d at 1227. She also filed an in forma pauperis application, which was later denied, and she paid her filing fee by the deadline imposed by the court, which fell 133 days after she received the right-to-sue letter. Id. at 1230. The defendant argued that the complaint was time-barred because it was “filed” after the ninety-day statutory deadline, even though it was originally submitted to the clerk within the time limit.
The district court dismissed the lawsuit, and we reversed, holding that “[a]s with other pleadings and papers, a complaint is filed ‘by delivering it ... to the clerk.’ ” Id. at 1232-33 (quoting Fed. R. Civ. P. 5(d)(2)). Though Escobedo advanced “constructive filing” and equitable tolling theories, we based our decision on other grounds. We noted that “scant justification exists to invoke” the “legal fiction” inherent in those theories because “[i]t is undisputed that the complaint was actually, physically delivered to the clerk....” Id. at 1231-32.
Similarly, in Ordonez v. Johnson, 254 F.3d 814, 816 (9th Cir. 2001) (per curiam), we held that a pro se prisoner complaint was timely filed when delivered to the clerk, even though the clerk rejected the complaint for noncompliance with a local rule requiring submission of a courtesy copy. We reasoned that “elevat[ing] a local rule ... to the status of a jurisdictional requirement would conflict with the mandate of Federal Rule of Civil Procedure 1 to provide a just and speedy determination of every action.” Id. (internal quotation marks and citations omitted).
Likewise, in Klemm v. Astrue, 543 F.3d 1139 (9th Cir. 2008), Klemm mailed his notiee of appeal to the clerk’s office, along with a post-dated check for the filing fee. The clerk rejected the notice and instructed Klemm to file electronically, as required by local rule. He did" so, but his electronic filing fell three days after the relevant deadline. We held the notice of appeal “was deemed filed when it ‘arrived in the hands of the Clerk within the statutory period.’ ” Id. at 1143 (quoting Loya v. Desert Sands Unified Sch. Dist., 721 F.2d 279, 280 (9th Cir. 1983)). We reasoned that “filing requirements dictated by local rules are not jurisdictional.... Local rules govern local practice, but a violation of local rules cannot divest this court of the jurisdiction afforded to it by Congress.” Id. (citation omitted).
In this case, the Demarees’ Rule 59 motion was “actually, physically” delivered to the clerk when it was timely lodged in conjunction with the request to file under seal. Escobedo, 787 F.3d at 1232. And the district court treated the motion as filed, as it ruled on the merits of the motion.[4] Accordingly, the time to file an appeal began running from May 27, 2014, the date of the district court’s final order, and the Demarees timely filed their Notice of Appeal, on June 23, 2014.
Judge N.R. Smith’s dissent cites to several cases that distinguish between lodged and filed documents for purposes of determining whether a document is included in the record under Federal Rule of Appel *1074 late Procedure 10(a), Dissenting Opn. of Smith, N.R., C.J., at 42-44 (citing Nicholson v. Hyannis Air Serv., Inc., 580 F.3d 1116, 1127 n.5 (9th Cir. 2009); Barcamerica Int’l USA Trust, v. Tyfield Imps., Inc., 289 F.3d 589, 594-95 (9th Cir. 2002); Levald v. City of Palm Desert, 998 F.2d 680, 684 n.1 (9th Cir. 1993)). Those cases are not relevant here, both .because we are addressing a question of timeliness concerning when a pleading was filed, not determining the content of the evidentiary record on appeal, and because the district court resolved the motion on its merits, thereby treating it as if it were filed.
We therefore hold that this appeal is timely.
B. Qualified Immunity
We next consider whether Peder-son and Van Ness were entitled to qualified immunity when they removed T.D., J.D., and L.D. from their home without judicial authorization..
Section 1983 provides a remedy for the violation of constitutional rights by any person acting under color of state law. 42 U.S.C. § 1983. But it does not provide a remedy for all constitutional violations. “The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have. known.” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (internal quotation marks omitted). We use a two-step test to evaluate claims of qualified immunity, “under which summary judgment is improper if, resolving all disputes of fact and credibility in favor of the party asserting the injury, (1) the facts adduced show that the officer’s conduct violated a constitutional right, and (2) that right was ‘clearly established’ at the time of the violation.” Kirkpatrick v. Cty. of Washoe, 843 F.3d 784, 788 (9th Cir. 2016) (en banc).
This section 1983 action concerns parents’ and children’s “well-elaborated constitutional right to live together without governmental interference.” Burke v. Cty. of Alameda, 586 F.3d 725, 731 (9th Cir. 2009) (internal quotation marks and citation omitted). In particular, “[ujnder the Fourth Amendment; government officials are ordinarily required to obtain prior judicial authorization before removing a child from the custody of her parent.” Kirkpatrick, 843 F.3d at 790.
There are narrow, circumstances .in which the government may constitutionally remove children from their families temporarily without judicial authorization. In an emergency, government officials may take a child out of her home and away from her parents without a court order “when officials have reasonable cause to belieye that the child is likely to experience serious bodily’ harm in the time that would be required to obtain a warrant.” Kirkpatrick, 843 F.3d at 790 (original italics'and internal quotation marks omitted). This requirement “balance[s], on the one hand, the need to protect children from abuse and. neglect and, on the other, the preservation of the essential privacy and liberty interests that families are guaranteed under both the Fourth and Fourteenth Amendments of our Constitution.” Rogers v. Cty. of San Joaquin, 487 F.3d 1288, 1297 (9th Cir. 2007).

(i) Constitutional violations

The Demarees, on behalf of themselves and their children, claim Pederson and Van Ness violated their clearly established constitutional rights when Pederson removed the children from the home without a court order and absent an emergency.[5]

*1075 We begin with the first step of our qualified immunity inquiry—whether the social workers acted constitutionally when they took the Demaree children from their parents without court.authorization. “Serious allegations of abuse that have been investigated and corroborated usually give rise to a ‘reasonable inference of imminent danger sufficient to justify taking children into temporary custody' if they might again be beaten or molested during the time it would take to get a warrant.” Rogers, 487 F.3d at 1294-95 (quoting Ram, 118 F.3d at 1311). We therefore consider whether the defendant social workers had reasonable cause to believe that T.D., J.D., and L.D. were at imminent risk of serious bodily injury or molestation. Wallis, 202 F.3d at 1138.
Viewing the facts in the light most favorable to the Demarees, the social workers did not have reasonable cause to believe the children were at risk of serious bodily harm or molestation. Pederson and Van Ness did not represent that the De-maree children might “again be beaten or molested,” Rogers, 487 F.3d at 1294, if left in their home—the children were never beaten or molested in the first place. Instead, the articulated concern was that the children could be subjected to, future criminal “sexual exploitation” because the parents had “tak[en] sexually explicit pictures of all three children.”[6]

It is helpful to identify what this stated risk did not include. The risk identified by the defendants did not include taking photos of a nude child in an exploitative situation and distributing them, because there was no allegation or indication that A.J. and Lisa had distributed, or were likely in the future to distribute, nude pictures of their children, to anyone.[7] Nor did the identified risk include taking photos of a nude child engaging in sexual conduct, because there was no allegation A.J. and Lisa had ever taken, or were likely to take, photos of their children engaging in sexual conduct.[8] And the risk was not that the De-marees would see. their own children, ages five, four, and one-and-a-half, nude, includ *1076 ing their genitalia, as caring for children of those ages necessitates doing so.
Most important, the articulated risk— taking sexually explicit photos—did not include any risk of physical sexual abuse. There was no allegation that A. J. and Lisa were likely to put their children at risk of sexual assault or abuse; indeed, after the children were professionally evaluated for signs of sexual abuse, Detective Krause reported that “neither could provide any information relevant to the investigation,” and Detective Shearer stated that “[T.D.] and [J.D.] did not make disclosures in the forensic interviews.” At the end of the evaluations, Detective Krause reported that “[Child Protective Services] declined to remove the children from the parent’s custody [sic], and ... directed Detective Shearer to return the girls to Lisa and A.J.”
Nor did Pederson act on fear of physical sexual abuse. Before removing the' children, Pederson filled out a “Temporary Custody Notice,” which included a space instructing investigators to “[c]heck the circumstances (imminent risk factor) that most clearly describes the reason temporary custody was necessary.” She did "not check the box for situations where “[t]he child’s caregiver has engaged in sexual conduct with a child, or has allowed the child to participate in sexual activity with others.” Instead, Pederson checked “[o]ther,” and wrote, “mother & father have taken sexually explicit pictures of all three children.”
Further, any cognizable risk could not have been imminent in the sense our case law requires—that the children “might again be beaten or molested during the time it would take to get a warrant.” Rogers, 487 F.3d at 1294-95. The defendants suggest that we should measure imminence in this case in days and potentially weeks, noting that under Arizona Revised Statute § 8-824(A), the earliest a court could have conducted a full hearing would have been five to seven days after a dependency petition was filed. But Arizona law recognizes that juvenile courts can issue same-day “motions for pickup.” See Ariz. Dep’t of Econ. Sec. v. Lee ex rel. Cty. of Maricopa, 228 Ariz. 150, 151, 264 P.3d 34 (Ariz. Ct. App. 2011) (noting that the department filed a dependency petition and, “[o]n the same day, the juvenile court granted a motion for pickup of the Child based on [the department’s] assertion that the ‘child is at imminent risk of abuse and/or neglect due to Mother’s substance abuse’”); see also Tyren T. v. Dep’t of Child Safety, No. 1 CA-JC 16-0091, 2016 WL 4474154, at *1 (Ariz. Ct. App. Aug. 25, 2016); Michael C. v. Ariz. Dep’t of Econ. Sec., No. 1 CA-JV 12-0005, 2012 WL 1964581, at *1 (Ariz. Ct. App. May 31, 2012); Magdaline L. v. Ariz. Dept. of Econ. Sec., No. 1 CA-JV 08-0076, 2008 WL 5403657, at *1 (Ariz. Ct. App. Dec. 30, 2008).
Here, the parties agree that the juvenile court was not open on Labor Day weekend, when the events in this case occurred. We therefore consider imminence of harm in terms of days rather than hours.[9]

This consideration is straightforward. The defendants did not suggest that there was any possible harm of the requisite sort to the children before the juvenile courts would reopen after the holiday. Again, there was no evidence of sexual assault or abuse; the defendants did not and do not rely on the children’s forensic examination and interview as indicating otherwise. Because the defendants did not identify any risk of physical injury or molestation to *1077 the children, they did not identify the requisite risk of imminent physical injury or abuse.[10]

In sum, viewing the record most favorably to the Demarees, there was no suspected risk to the children of serious bodily harm, including molestation, imminent or otherwise. Therefore, viewing the record most favorably to the Demarees, the defendants acted unconstitutionally in taking the three children away from home without judicial authorization,

(ii) Whether the constitutional right was clearly established

We move to the second step of the qualified immunity inquiry—whether the relevant judicial precedents at the time of the incident clearly gave notice that what happened here violated the Demaree family’s Fourth and Fourteenth Amendment rights. We conclude that the applicable precedents did provide that notice.
In 2007, the year before the events in this case took place, Rogers held that a social worker violated a family’s clearly established federal rights by removing children with no warrant because of reports that a three-year-old and five-year-old “were not toilet-trained, were locked in their rooms at night and in a room at their parents’ business during the day, were not receiving medical or dental care, that [one] had lost his teeth due to bottle rot, that [the other] was still being fed with a bottle, that their home was dirty and maggot-infested, and that there were unsecured guns in the home.” Rogers, 487 F.3d at 1291. The social worker in that case “could have obtained a warrant within hours,” and “[t]here [was] no indication in the record that so short a delay could have resulted in a significant worsening of the children’s physical conditions or an increase in the prospects of long-term harm.” Id. at 1295. One child’s “ ‘pain’ was not so serious that he ceased to be ‘playful’ and ‘alert,’ ” the physical risk the children faced from being locked in a room for the time it would take to obtain a warrant was “very low,” and “the mess in the Rogers living quarters ... was a chronic, ongoing problem.” Id.

Even in the face of this significant accumulation of neglect and bodily harm, which all parties agreed had resulted in bodily injury to the small children, we held that there was no reasonable cause to believe an exigency supported the children’s warrantless removal. Id. at 1296. We concluded that their removal therefore violated their clearly established rights. Id.

Here, there had been no actual or threatened physical harm to or physical sexual abuse of the Demarees’ children before they were taken from their home. So the likelihood that they would suffer such abuse in the days it would take to get a warrant was necessarily less than the likelihood of future physical injury to the Rogers’ children in the hours it would take to get a warrant.

*1078 Similarly, in Mabe v. San Bernardino Cty., 237 F.3d 1101, 1109 (9th Cir. 2001), viewing the facts in the light most favorable; to the plaintiff family, we held that a jury could have found that a defendant social worker violated a mother’s clearly established constitutional rights by removing her teenage daughter from her home without a warrant. We were unpersuaded that the sexual abuse .allegations were exigent as a matter of law, even though the teenager’s stepfather sexually abused her by “touching] her breasts and crotch area through her clothing at night in her bedroom ,.. every other night for ... two or three months.” Id. at 1104-05. We reasoned that, “[although the conduct by the stepfather was clearly inappropriate, it did not involve violence or penetration and the only time it had taken place was at night when MD was in her bedroom. Assuming that [the worker] could obtain a warrant the same day ..., it is difficult to understand how the further delay of a few hours necéssary to obtain the warrant would have put MD in imminent danger of serious physical injury.” Id. at 1108 (internal footnote omitted). That conclusion was further underscored by the fact that the social worker “opted to leave MD in the residence after interviewing MD and Mabe about the alleged molestation.”[11]
Id.

Despite quite serious allegations of physical sexual assault and bodily injury in Mabe, we were unwilling to hold as a matter of law that there was reasonable cause to believe there would be “imminent danger of future harm” within the time it would take to get,, a warrant. Id. We held, instead, that “a reasonable jury could conclude that [the mother’s] constitutional rights were violated,” id. at 1109. We do the same here.[12]

The defendants disagree with the. above analysis. They suggest that eases in the Ninth Circuit do not clearly establish the constitutional requirements for warrantless removals of children in the event of allegedly exploitative photos of nude children because those cases deal with other forms of sexual abuse and involve court orders available within a few hours rather than a few days.
When evaluating qualified immunity claims, “[w]e do" not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.” Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). It is “beyond debate,” id., that existing Ninth Circuit precedent establishes that .children can only be taken from home without a warrant to protect them from imminent physical injury or molestation in the period before a warrant could be obtained, See Mabe, 237 F.3d at 1108-09. The clearly established case law requires articulable, imminent, and serious physical injury or physical abuse to children to justify removing them from their parents’ home without a judicial order. There was no, such injury identified here.

*1079 Put another way, to say a child can be removed only if x is likely to happen necessarily means she cannot be removed if there is no indication that x is likely to happen. That there is no case law concerning a situation in which y, but not x, may be likely to happen does not make the rule setting the standards for removal any less clear—the rule is that only a reasonable fear of x, not y, can provide a constitutional basis for exigent removal.
Here, the rule remains that there can be no removal without a court order “absent evidence that the child was in imminent danger of serious bodily injury.” Kirkpatrick, 843 F.3d at 792. The risk identified here simply does not meet that standard, as it does not involve physical injury or abuse.
Notably, unlike in Kirkpatrick, the issue here is not the level of risk in a particular circumstance. See ids="12173302" index="67" url="https://cite.case.law/f3d/843/784/#p789">id. In that case, a mother who had abused methamphetamine gave birth to a child and, although both stayed in the hospital to recover, several social workers assumed temporary custody of the newborn without a warrant. Id. at 786-87, Because no case had addressed the level of risk of physical harm at issue where a potentially abusive mother is in the hospital but could leave with the child, we held that the social workers were entitled to qualified immunity. Id. at 793. Here, though, the social workers never identified any risk of harm to the children over the applicable period that comes within the exigent circumstances standard articulated in Wallis and its progeny.
Further, the case law was clear in 2008 that it does not matter whether the warrant could be obtained in hours or days. What matters is whether there is an identifiable risk of serious harm or abuse during ivhatever the delay period is. See Rogers, 487 F.3d at 1294-1295 (“Serious allegations of abuse that have been investigated and corroborated usually give rise to a reasonable inference of imminent danger sufficient to justify taking children into temporary custody if they might again be beaten or molested during the time it would take to, get a warrant.” (emphasis added and internal quotation, marks omitted)); United States v. Echegoyen, 799 F.2d 1271, 1279 n.5 (9th Cir. 1986) (“Exigent circumstances necessarily imply that there is insufficient time to get a warrant.”); United States v. Good, 780 F.2d 773, 775 (9th Cir. 1986) (“Exigent circumstances alone ... are insufficient as the government must also show that a warrant could not have been obtained in time.”).
We note that at least one other federal court of appeal has dealt with facts similar to those before us. In Malik v. Arapahoe Cty. Dep’t of Soc. Servs., 191 F.3d 1306, 1309 (10th Cir. 1999), the Tenth Circuit held that, viewing the facts in the light most favorable to the Maliks, a police officer and social worker could have violated Ms., Malik’s and her four-year-old daughter’s clearly established constitutional rights. The defendants had removed the daughter on the authority of a court order obtained through misrepresentation several weeks after they had discovered a set of ten photographs portraying the daughter partially clothed, “some with full frontal genital exposure.” Id.
 
[13]

 The daughter’s uncle, an artist, had taken the photos five months earlier, and the mother had sent the photos to be processed; as here, the photo processing center called the police. Id.

The Tenth Circuit held that the defendants were not entitled to qualified- immunity, Id. at 1315. That “conclusion hinge[d] upon the district court’s finding that ‘[defendants acknowledged [the daughter] was in no imminent danger at the time they *1080 sought the order and the facts suggested] [the warrant] was secured only through distortion, misrepresentation and omission.’” Id. at 1315 n.5. In the absence of imminent danger that the daughter would be the subject of more photographs—even if the sexual exploitation inherent in the existing ones would have justified removal—the government could not remove the daughter without a legitimate judicial order. Clearly established law, said the Tenth Circuit, compelled that conclusion.
To recap: We do not here deal with a “general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment,” which “is of little help in determining whether the violative nature of particular conduct is clearly established.” al-Kidd, 563 U.S. at 742, 131 S.Ct. 2074. Instead, we have here a very specific line of cases, culminating in Rogers and Mabe, which identified and applied law clearly establishing that children may not be removed from their homes without a court order or warrant absent cogent, fact-focused reasonable cause to believe the children would be imminently subject to physical injury or physical sexual abuse. Rogers, the last in the series before the events in this case, summarized that law and explained why qualified immunity was inapplicable: “Prior to the events in question, we had repeatedly held that a family’s rights were violated if the children were removed absent an imminent risk of serious bodily harm. A reasonable social worker would need nothing more to understand that she may not remove a child from [his or her] home on the basis of a [situation] that does not present such a risk.” 487 F.3d at 1297. Mabe, Rogers, and their predecessors thus gave clear notice of the law to social workers responsible for protecting children from sexual abuse and families from unnecessary intrusion.
We accordingly reverse the district court’s grant of qualified immunity to Ped-erson and Van Ness.
C. Motion to Seal
“[C]ourts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.” Nixon v. Warner Commc’ns, Inc., 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (footnotes omitted). We therefore “start with a strong presumption in favor of access to court records.” Foltz, 331 F.3d at 1135. “A party seeking to seal a judicial record.... must ‘articulate[ ] compelling reasons supported by specific factual findings.’ ” Kamakana v. City & Cty. of Honolulu, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting Foltz, 331 F.3d at 1135). “ ‘[Compelling reasons’ sufficient to outweigh the public’s interest in disclosure” exist when court records might “ ‘become a vehicle for improper purposes,’ such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets.” Id. at 1179 (quoting Nixon, 435 U.S. at 598, 98 S.Ct. 1306). “The mere fact that the production of records may lead to a litigant’s embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records.” Id.

The Demarees’ arguments can be summarized as follows: (1) sealing the summary judgment order is necessary “to protect[ ] the privacy and innocence of children”; (2) Arizona law provides that records related to CPS investigations are confidential; and (3) the unsealed order could be used for improper purposes, such as to provide “sexual[ ] stimulation].”
None of these are compelling reasons for sealing the order here. First, the district court properly protected the privacy of the children by maintaining under seal *1081 any motions or exhibits containing their full names or identifying information. Second, Arizona law prohibits the Department of Economic Security from releasing “files that contain information related to investigations conducted by child protective services.” Ariz. Rev. Stats. § 41-1959(A). It also provides that “records of ... dependency proceeding^] shall not be open to public inspection.” Ariz. Rev. Stat. § 8-208(F). But ,the summary judgment order neither releases any CPS files nor opens the records of any dependency proceeding. In short, the district court did not violate Arizona law by publishing the order.
Finally, the district court order employed clinical, anatomically correct language to briefly describe the nudity depicted in the photographs at issue. The unquantifiable odds that an unsavory individual might find this language titillating does not create a compelling reason for removing it from the public record—especially since the Demarées did not file their Complaint under seal, and in fact gave public interviews in which they, themselves, described the photos and the nudity depicted.
III. Conclusion
We affirm the district court order denying the Demarees’ motion to seal the summary judgment order. We reverse the district court order granting summary judgment in favor of Pederson and Van Ness based on qualified immunity. We remand for further proceedings consistent with this opinion.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

. Judge Berzon concurs in the entirety of this opinion. Judge N.R. Smith concurs in all but Part II(A)(ii) of this opinion. Judge Zouhary concurs in all but Part II(B)(ii) of this opinion.

. Pederson and Van Ness did not rely upon the forensic interviews before or after they decided to remove the children.

. See also Obaydullah v. Obama, 688 F.3d 784, 788-91 (D.C. Cir. 2012) (describing the relationship between Fed. R. App. P. 4(a)(4) and 28 U.S.C. § 2107, and explaining that the tolling provision of Rule 4(a)(4) has no statutory analog).

. We look to the substance and effect of an order, not solely its title. See Delta Computer Corp. v. Samsung Semiconductor & Telecomm. Co., 879 F.2d 662, 665 (9th Cir. 1989).

. The Demarees contend, alternatively, that even if the removal itself was proper, Peder- *1075 son and Van Ness violated their and their children's constitutional rights by placing the children in non-relative foster care, rather than directly placing them with their relatives. Because we agree with the Demarees that the removal was improper, we do not consider this alternative contention.

.The defendants rely on the investigation into the parents’ potential violation of Arizona’s criminal law concerning the sexual exploitation of a minor. Under that law, "[a] person commits sexual exploitation of a minor by knowingly: 1. Recording, filming, photographing, developing or duplicating any visual depiction in which a minor is engaged in exploitative exhibition or other sexual conduct. 2. Distributing, transporting, exhibiting, receiving, selling, purchasing, electronically transmitting, possessing or exchanging any visual depiction in which a minor is engaged in exploitative exhibition or other sexual conduct.” Ariz. Rev. Stats. § 13-3553(A). “Exploitative exhibition" is defined as "the actual or simulated exhibition of the genitals or pubic or rectal areas of any person for the purpose of sexual stimulation of the viewer.” Id. § 13-3551(5). Here, reviewing the facts in the light most favorable to the plaintiffs, there was ho evidence that the parents meant to use the photographs for sexual stimulation of themselves or anyone else, much less to take new photographs for that purpose.

. Also, taking the children away would not prevent the parents from distributing existing photographs were they so inclined—which there is no indication that they were.

. It would be inappropriate to attach the photographs, to this opinion, as doing so could further invade the children’s privacy interests in anonymity. We note, however, insofar as Judge Zouhary’s dissent suggests that the photographs portrayed the children in "provocative poses,” see Dissenting Opn. of Zouh-ary, J., at 1085, we see that portrayal of the photographs as inaccurate. The term suggests frontal nudity or sexually explicit poses, neither of which was represented.

. The plaintiffs do not argue that the absence of available judicial officers over the weekend, and the consequent unavailability of a timely judicial determination, constituted a due process violation in itself.

. Even focusing—inappropriately—on whether there was evidence that the Demar-ees would likely take more nude pictures of their children, or distribute new or existing pictures, in the few days before the government could get a court order, there was no such evidence. At the time she removed the children, Pederson did not identify any imminent future photography on her notice of temporary removal; rather, she noted that "mother & father have taken sexually explicit pictures of all three children” (emphasis added). It does not appear that Pederson reasonably could have identified more photography as an imminent risk, because the police had taken from the Demarees’ home all the cameras, cell phones, computers, and printers found (in addition to potentially relevant photographs, undeveloped film, floppy disks, DVDs, CDs, and VHS tapes), as they explained to Pedetson before she removed the children. And, again, there was no evidence that the parents had ever distributed or had any intent to distribute the photos.

. Similarly here, Child Protective Services initially returned the children to their parents.

. Cases applying Rogers and Mabe after the events giving rise to this case, while not directly applicable to the clearly established law inquiry, confirm our understanding of Rogers and Mabe. We háve continued to be cáreful to emphasize the need for a clear showing of bbth imminence and specific, serious physical danger to the child. For example, in Burke v. Cty. of Alameda, 586 F.3d 725, 731-32 (9th Cir. 2009), we held that, under circumstances of that case,. in which a stepfather’s sexual abuse and physical violence could recur at any time according to the child's report of abuse, there was reasonable cause to believe that an imminent risk- of serious bodily injury justified a the child’s warrantless removal. We reiterated .that “[p]olice officers must have specific, articulable evidence ... that a child is in imminent danger of abuse.” Id. at 731 (internal quotation-marks omitted).

. None of the photographs here at issue meets that description,